Ruby HEWITT; Ralph Winant; Jerry Weitman; Darrell Barker and Dennis Molloy, Plaintiffs,

v.

John JOYNER; Robert Hammock; Jon D. Mikels; Barbara Riordan; and Larry Walker, in their official capacities as members of the San Bernardino County Board of Supervisors; Yucca Valley Parks and Recreation District, Defendants.

No. CV 87–7605 DWW (JRx).

United States District Court,
C.D. California.

Feb. 6, 1989.

Carol A. Sobel and John Hagar of the ACLU Foundation, Los Angeles, Cal., for plaintiffs.

David L. Llewellyn, Jr., Santa Ana, Cal., for defendants.

## MEMORANDUM OPINION

DAVID W. WILLIAMS, District Judge.

This civil rights action, brought under 42 U.S.C. section 1983, came on for trial before the court sitting without a jury on January 24, 1989. Carol A. Sobel and John Hagar of the ACLU Foundation of Southern California, seeking declaratory and injunctive relief, appeared for plaintiffs. David L. Llewellyn Jr. appeared for defendants. The court heard witnesses for both sides, received documentary evidence and heard arguments of counsel. Thereafter, the matter was taken under submission.

### FACTS OF THE CASE

This suit challenges the constitutionality of the County of San Bernardino's owning and maintaining with public funds, a 3.5 acre public park located in Yucca Valley California, because the park features a collection of biblical statuary. The park was originally owned by Antone Martin, a sculptor, who lived on the park site from 1953 until his death in 1961. He devoted all those years to the creation of white concrete statuary depicting various biblical scenes. The collection consists of 36 statues and tableaus which are scattered among the indigenous Joshua trees and cottonwoods and was intended as describing the life of Christ. The sculptor attempted to create scenes as they may have been enacted two thousand years ago. Antone Martin dedicated the collection of statues as a World Peace Shrine portraying the artist's concept of peace on earth and good will toward men.

The statues, which were created on the site, are made of solid concrete and were given triangular bracing extending down into a block of cement underground, thus firmly anchoring the entire work. The statues weigh from 4 to 16 tons each, except for the Last Supper facade, which is estimated to weigh 125 tons. The park is nestled on a slope of a desert hillside, and the statues are arranged in several groupings which permit visitors to walk in the area and enjoy the scenes as if in an outdoor museum.

When Antone Martin died, his heirs donated the property to the County by a deed which contained the condition that it be maintained with the biblical statuary. The deed contained a reversionary clause.

Since 1961, the County has maintained the property as a public park, which is open 24 hours a day. The public may visit without an admission charge. Picnic tables are available for use without reservation.

From time to time, there were persons who complained about the use of public money to maintain the park. In an effort to mollify such persons, the Board of Supervisors caused a fence to be erected between the park and a church that was located on the adjoining property (but which had no connection with the park site), and changed the name of the park from Desert Christ Park to the Antone Martin Memorial Park. A sign was erected disclaiming any intention to maintain the park for religious purposes. No meetings of any kind, religious or otherwise, are held in the park and it is open for the enjoyment of all persons who may want to use the area.

The plaintiffs in the present action all claim to be residents and citizens of the County of San Bernardino. They allege that they have lost a beneficial right to use and enjoy the park because of their objections to its public ownership. Hewitt professed to being a Christian. Winant and Barker state that they are atheists; Weitzman said he is of the Jewish faith and Molloy claimed to be an agnostic. All claim to be offended whenever they desire to visit and utilize the park's facilities because they assert that the park is dedicated solely to religious themes. (Molloy and Barker submitted declarations and testified at trial for the plaintiffs.)

Jurisdiction is conferred on the court by 28 U.S.C. section 1331, which provides for original jurisdiction over federal questions, by 28 U.S.C. sections 2201 and 2202 of the Declaratory Judgment Act, and 28 U.S.C. section 1343, which provides for federal jurisdiction in actions authorized by 42 U.S.C. section 1983.

## ISSUE

The issue before the court is whether the ownership and maintenance by the County of San Bernardino of a public park containing a collection of permanent statuary depicting replicas of New Testament figures violates the establishment clause of the First Amendment to the United States Constitution and the parallel provisions of the California Constitution?

In analyzing this issue, the threshold question for the court is whether plaintiffs have stated a concrete and palpable injury for purposes of standing. Second, after placing into context the historical complexities surrounding analysis of the establishment clause, the tripartite test utilized in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), shall be applied. Lastly, the court shall examine pendant state claims alleging violations of the California Constitution.

## STANDING

Article III of the Constitution limits the judicial power of the United States to the resolution of cases or controversies. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In order to satisfy the "case or controversy" requirement, a litigant must have standing to challenge the action sought to be adjudicated in the lawsuit. *Id.; Freedom From Religion Foundation, Inc., v. Zielke*, 845 F.2d 1463, 1467 (7th Cir.1988). The concept of standing subsumes a blend of constitutional requirements and prudential considerations. *Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 758.

At a minimum, Article III of the United State Constitution requires that the litigant satisfy three requirements: (1) he must have suffered personally an actual or threatened injury in fact; (2) the injury must be a result of the defendant's action; and (3) the injury must be redressable by a judicial decision. *Id.* at 472, 102 S.Ct. at 758.

The court will first address the primary issue of whether or not plaintiffs have Article III standing by focusing on whether plaintiffs have suffered an injury in fact.

As long as a plaintiff alleges the existence of a distinct palpable injury, even a

minor injury can satisfy the case or controversy requirement of Article III. *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759; *Freedom From Religion Foundation*, 845 F.2d at 1467. A concrete injury in establishment clause cases has been found where a curtailment of rights to use public areas has been alleged. *See ACLU of Illinois v. City of St. Charles*, 794 F.2d 265, 267–269 (7th Cir.1986), cert. denied, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986). In the instant case, plaintiffs Darrell Barker and Dennis Molloy both claim to have had their rights to use a public area curtailed.

■ Barker, an atheist, finds the park's religious content so disturbing that he refuses to use the public park and avoids driving past it when his work requires that he be in the area. Molloy, an agnostic, frequently uses county parks for his family's recreation, but will not use this park because of the statuary.

Both Barker and Molloy state more than psychological injury in that they had to physically change their normal routine and essentially were denied access to a public area because of their strong disapproval of the religious statuary. Both plaintiffs have therefore, alleged palpable injuries capable of being redressed by the court for purposes of standing. *See St. Charles*, 794 F.2d 265 (standing found where plaintiffs were so offended by a lighted cross so as to depart from their accustomed route of travel to avoid it); *ACLU of Georgia v. Rabun County, etc.*, 698 F.2d 1098 (11th Cir.1983) (standing found where lighted cross viewable from state parks caused plaintiff campers to refuse to use the parks).

■ Also, as county taxpayers, plaintiffs have standing to bring this equitable action. *See Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) ("Resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation.") Defendants contend that plaintiffs have not properly traced their tax

dollars to the County's Park and Recreation District. Since general funds were used as a portion of the district budget, however, a clear inference exists that at least a proportionate share of plaintiffs' taxes pay for the park's upkeep.

## ESTABLISHMENT CLAUSE

The First Amendment to the United States Constitution declares that "Congress shall make no law respecting an establishment of religion...." The establishment clause has been interpreted by Justice Black in *Everson v. Board of Education*, thusly:

"The establishment of religion clause of the First Amendment means as least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.... In the words of Jefferson, the clause against establishment of religion was intended to erect a wall of separation between church and state." 330 U.S. 1, 15, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947)[1]

The origin of our country is intertwined with that of religion. This historical truth, along with present day religious diversity and pluralism, has placed strains on the concept of a mythical wall separating church and state.

In 1971, Chief Justice Burger, writing for the majority, acknowledged this strain, stating that the Court's "prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense." *Lemon v. Kurtzman*, 403 U.S. at 614, 91 S.Ct. at 2112. He reiterated this theme in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984): "In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has often noted, total

1. Thomas Jefferson first discusses the concept of a "wall of separation" between church and state in a letter to Danbury Baptist Association dated January 1, 1861. 8 The Writings of Thomas Jefferson 113, (Washington ed. 1861).

separation of the two is not possible." *Id.* at 672, 104 S.Ct. at 1359.

Throughout the development of American society, there are innumerable instances of a break with the Jeffersonian notion of the wall. The members of the First Congress employed a congressional chaplain to offer daily prayers in Congress. The practice continues to this day and it is accepted as an example of accommodation that did not offend the Founders. *See Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (state legislature's practice of opening each day with a prayer was not violative of the establishment clause as this practice had become part of the historical fabric of our society). Thanksgiving was established as a national holiday by Congress to thank God for our bounty. Christmas has been designated by Congress as a national holiday to observe the birth of Christ and federal employees are compensated while being released from their duties.

█ The establishment clause, in conclusion, was never meant to create a "callous indifference" towards religion, but rather an accommodation of all religions in our pluralistic society. *Zorach v. Clauson* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954; *Lynch,* 465 U.S. at 673, 104 S.Ct. at 1359. This tension between accommodation and separation contributes to the Court's uneasiness in relying solely on the three-prong test first utilized by the Court in *Lemon v. Kurtzman* for determining violations of the establishment clause. In *Lynch,* the Court emphasized its "unwillingness to be confined" to "any single test or criterion." 465 U.S. at 679, 104 S.Ct. at 1362. The tri-partite *Lemon* test provides "guidelines" for examining possible impermissible government activity. *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).[2]

█ With the understanding that a rigid application of any mode of analysis conflicts with the complex historical interpretation of the establishment clause, I turn to the three-prong test as set out in *Lemon* as a general guideline for the court's analysis. First, the statute (or activity) must have a secular purpose; second, its primary effect must be one that neither advances nor inhibits religion; finally, the statute (or activity) must not foster an excessive government entanglement with religion. 403 U.S. 602, 91 S.Ct. at 2107.

*Secular Purpose*

In *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Court said that to withstand the strictures of the establishment clause, state action asserted to violate that clause must have a secular purpose and a primary effect that neither advanced nor inhibited religion. The rationale of the rule is to prevent the use of public property in such a manner as to connote governmental sponsorship of religious beliefs with the attending result that persons who do not share those beliefs might feel that their own convictions were stigmatized or officially deemed less worthy than those awarded the appearance of official endorsement.[3]

More specifically, the purpose requirement "aims at preventing relevant governmental decision makers ... from abandoning neutrality and acting with intent of promoting a particular point of view in religious matters." *Corp. of Presiding Bishop v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). In order to find a violation of the purpose prong, the court must be convinced that the motivation for the government's activity lacks secular purpose and is "motivated wholly by religious considerations." *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362.

**2.** Although described as no more than a "helpful signpost" (*Hunt v. McNair,* 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)), the *Lemon* test has been followed, if not rigidly, by the Supreme Court with the exception of *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In *Marsh,* a historical approach predominated in finding prayer before a legislative session not violative of the establishment clause. *Id.*

**3.** Religious Freedom—Public Symbols, 336 ALR 3d 1256, 1260.

In *Lynch*, the Court found the district court to be in error for solely focusing on the religious symbolism of a creche. When viewed in context, the creche was said to have a primarily secular purpose given the surrounding displays and the fact that this nation officially celebrates Christmas. Likewise, in the instant case, the artistic, cultural and historical significance, and the manner of displaying the sculptures must demonstrate a secular purpose on the part of government.

■ Here, the park involved was not created by the County, nor were any public funds used in its creation. It cannot be said that public officials conceived the idea of, or collaborated to establish the statuary park for any purpose whatsoever. What must be kept in mind is that the park was entirely the creation of Antone Martin and that after his death, it was given without any financial cost to the County in exactly the same condition it was theretofore maintained.

Such a gift could be well understood to be appreciated by county officials for the cultural, artistic, and economic benefits it offered to citizens of San Bernardino County. Located 67 miles from the core of county government and the urbanity of the highly populated residential and business sections of this sprawling county, the park is located in a desert area called Yucca Valley and serves as an oasis for the cultural appreciation for the sparse population in its immediate environs. Having acquired the park and its statues intact, it behooved the County to distance itself from the appearance of maintaining a publicly funded area dedicated to religious themes. A basis existed for sensitive members of the public to decry the gift because of the inclusion of replicas of New Testament figures.

County officials saw to it that none of the statues contained any labels identifying the depiction or linking any likeness to the Christian religion. No signs were in evidence anywhere that would suggest county endorsement of a religion. No religious meetings of any kind were permitted on the area and the name of the park was changed to one which attempted to make clear that the property was a memorial to the sculptor and his theme of peace, and not a place dedicated to one religion.

A fence was erected between the park and an adjoining church property to reflect the separate existence of the two. Brochures prepared by the County invited the park's public use by persons who possessed an appreciation for art and culture and it was openly available for visitors on a 24–hour basis at no admission charge. From public funds, the County bore the expense of maintaining the park at the cost of approximately $5,500 annually—a rather minimal amount.

To determine the original purpose of the creation of the park by Martin, it is helpful to look at the man himself. We are told that he was not a man of great religious bent.[4] He is pictured as a man whose accent was on world peace and who used his artistic talents to give expression to peaceful themes. Salvador Dali was another artist who pointed part of his talents toward sending to the world a message of his abhorrence of war.[5]

In view of the park's cultural, historical and artistic value to the community and to all those who visit, I find that the County's ownership and maintenance of the park serves a primarily secular purpose.

*Secular Effect*

■ The second inquiry under *Lemon* is whether the government action had the effect of advancing or inhibiting religion. "The mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125–126, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982). An important concern of the effects test is thus "whether the symbolic union of church and state affected by the challenged governmental action is sufficiently likely to

---

**4.** Exhibit 19.

**5.** Dali's *Face of War* is an example.

be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Grand Rapids School District v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). To this end, "government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Lynch*, 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring).

It is necessary to begin our analysis by determining what, if any, religious content exists in the display in question. Here, the park contains a collection of 36 larger than life-size statues and tableaus arranged in 13 scenes, primarily from the New Testament. One scene, for example, depicts a bearded man wearing a tunic or robe surrounded by similarly clad children. The artist, Martin, intended this tableau to represent Christ and children as described in the New Testament passages known as the Sermon on the Mount. Other scenes likewise depict themes taken from biblical narratives. Clearly, the park statuary, in content and appearance, reflect traditional Christian themes.

Noteworthy, however, is the lesser degree of sectarian symbolism attached to the statuary when compared to a creche or Latin cross which are so often the subject of cases and scholarly commentary. There is a critical difference between the sculptures in question, and the creche and Latin cross. The creche, and more so the Latin cross, epitomize Christian faith. In fact, the Latin Cross is the pre-eminent symbol of many Christian religions and clearly represents the key Christian concept of the Crucifixion and Resurrection of Christ. The creche depicts one of the most familiar Christian scenes, namely, the birth of Christ, and is synonymous with Christmas, a national holiday. Here the several depictions of New Testament scenes while having prominent significance to Christianity, nonetheless have not attained the same level of religious notoriety with the general public as a cross or a creche.

According to *Lynch*, however, the court's analysis cannot stop with the conclusion that the statuary in question has religious significance. Rather, "the critical inquiry is whether, considered in its unique physical context," the statuary at issue in this case "communicates a message of government endorsement." *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 127–128 (7th Cir.1987). I conclude that it does not.

Here the physical presentation and appearance of the statuary support the court's conclusion. Far from being the mannequin-like figures in many Nativity scenes, each of the 36 statues is made of concrete and polished to a shining white by Martin's patented process. Because of the weight of these larger than life sculptures, steel support bars were implanted inside each statue. Each figure has an expressive, well-chiseled face, clearly defined hand gestures, and body positions composed to communicate the particular subject matter depicted.[6] Overall, these sculptures are artistic works of an aesthetically pleasing nature, created by a skilled professional sculptor of local note.

Second, the setting or way in which the statues are presented conforms to the desert terrain.[7] The tableaus are spaced across the 3.5 mile park at intervals matching natural topographical features and plant growth. Aesthetically, the figures and terrain with its Joshua and cottonwood trees, compliment each other. As such, the setting is very much an important element in the overall artistry of the statues. The park as a whole retains the desert motif which historically characterizes this geographical area. It conforms to the cultural

6. Martin, a noted local sculptor, required 9 years to complete all of the statues. A Life Magazine picture showed the transportation of one of the larger statutes to its present site.

7. The parties have supplied exhibits consisting of large photographs of the entire park area, and witnesses testified helpfully as to what they saw when they visited the park. From all this, I am able to adequately envision this facility as constituting a small-to medium-sized ground area in a desert setting with some houses and a sparse pocket of population in the near vicinity.

ambience of the surrounding desert community.

Plaintiffs contend that the park emits a direct religious impression from the signs and brochures denoting the park's relationship to Christ. The fact that the statues and tableaus are religious in nature, however, does not diminish the apparent artistic qualities of the statuary. This point is aptly supported by *Lynch* wherein the Court found that the religious symbolism of the Pawtaucket creche considered in it context, communicated no government endorsement. 465 U.S. at 681–682, 104 S.Ct. at 1363–1364. The secular decorations surrounding the creche did not nullify its sectarian religious significance. Rather, the December holiday setting was the element that altered "what viewers may fairly understand to be the purpose of the display—[just] as a typical museum setting, *though not neutralizing the religious content of a religious painting, negates any message of endorsement of the content." Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring) (emphasis added).

Furthermore, the Court in *Lynch* observed that the "National Gallery in Washington, maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, the Resurrection, among others with explicit Christian themes and messages." *Lynch,* at 676–677, 104 S.Ct. at 1361. The Court concludes that its very chamber is adorned with a mural of Moses and the Ten Commandments. *Id.*

While one may recognize the religious content of the statuary, its cultural and historical significance, as well as its artistry, denotes a neutral governmental role and does not thereby benefit or endorse religion. This desert display provides San Bernardino with a cultural landmark of note. Antone Martin Sculpture Park, as such, is more like a museum in content and display, than a public park. The park, as the record indicates, is 67 miles from the County seat and stands as a resting place for travelers or as a local center for the

nourishment of tourists who have read of its collection of art pieces and desire cultural fulfillment. It has existed in its present form for 27 years under county ownership, and there is no tangible evidence of the County having used it as an endorsement of religion. In fact, the County has taken affirmative steps to disabuse the public of such notions.

Nothing that I have heard from the evidence convinces me that there is a subtle or any motive of governmental endorsement of religion. An objective person would not draw such an inference. I must lay this accusation only to the hypersensitive views of persons who are "looking under the rocks" for a cause of complaint. I therefore find that the County has not violated the effects prong of the *Lemon* test by owning and maintaining the park.

*Entanglement*

The third prong of the *Lemon* test prohibits governmental activity that excessively entangles the state with religion. The entanglement inquiry is divided into two discernible parts. First, the state must avoid administrative entanglement with religious authorities. The purpose of this prohibition is to avoid government entanglement in the administration of the church and to prevent church direction of government activities. *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982).

Second, impermissible entanglement may occur when government activity creates the danger of political fragmentation and divisiveness along religious lines. *Lemon,* 403 U.S. at 622–24, 91 S.Ct. at 2115–17. However, this inquiry is limited to the very narrow context of direct subsidy to religious institutions in most cases. *See e.g. Lynch v. Donnelly,* 465 U.S. at 683–685, 104 S.Ct. at 1364–66 (the Court observed that since the government's ownership and maintenance of the creche did not involve a direct subsidy to church sponsored schools or colleges, or other religious institutions, no inquiry into potential divisiveness is even called for).

The one case where the Court departs from this limited view is in *Grendel's*

*Den,* 459 U.S. 116, 103 S.Ct. 505. There the court invalidated a Massachusetts ordinance that gave churches the power to veto the issuance of liquor licenses to commercial enterprises located within 500 feet of church premises. Even though the case did not involve direct subsidies, Chief Justice Burger, writing for the majority, expressed his concern that "[t]he challenged statute ... enmeshes churches in the processes of government and creates the danger of 'political fragmentation and divisiveness along religious lines.'" *Id.* at 127, 103 S.Ct. at 512 (quoting *Lemon,* 403 U.S. at 623, 91 S.Ct. at 2116).

Common factors identified by courts in resolving the administrative inquiry of the entanglement prong include, the government's monetary contribution to, maintenance of, and general involvement with the display. *Lynch,* 465 U.S. at 683–685, 104 S.Ct. at 1364–66. In *Lynch,* the Court found that the creche did not create excessive entanglement between religion and government, reasoning that no "expenditures for maintenance of the creche" had been necessary; and, that since the town owned the creche, valued at $200, the tangible material it contributes is *"de minimis." Id.*

Here, the County's expenditure of public funds to maintain and operate the park is minimal (approximately $5,500 per year). The operating budget of the park is certainly *de minimis.* Moreover, the use of funds to maintain the park are appropriate to fund the preservation of artistic statuary solely on its basis as art.

In *Lemon,* the Court also identified the need for government supervision and surveillance as indicia of entanglement. The Court held that the supervision necessary to ensure that teachers in parochial schools were not conveying religious messages to their students would constitute the excessive entanglement of church and state.

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church." 403 U.S. at 619, 91 S.Ct. at 2114.

Plaintiffs also contend that there is excessive entanglement in part because there purportedly is no clear boundary of separation between the adjacent Evangelical Free Church and the subject park. First, a fence erected on the boundary between the two properties does substantially separate the church from the park. Secondly, as established at trial, there is no administrative or monetary interaction between the County government operating the park and the church.

Plaintiffs contend that defendants suffered entanglement in reviewing all park literature, signs and other property that may be placed there to ensure that it is not indirectly and/or incidentally religious in nature. On the one hand, the County will have to monitor and review the literature it prints regarding the park. It will also have to make sure that signs and other property it places on the park grounds do not advance religion. However, these efforts nowhere near approach the level of state surveillance and supervision or administrative involvement which the courts have found violate the entanglement prong. By contrast, here the County would produce, disseminate or display the potentially religious literature and signs (i.e. the park brochures, placards). Thus, the County would monitor itself rather than monitor the conduct of a religious institution, or a religious school as in *Lemon.* Moreover, there was no testimony at trial that a need or desire on the part of the County existed to change the park brochures. In fact, it appears that changing brochures and signs in the park, would not require constant supervision because they do not require regular revision or changes.

 In order to be successful on the political divisiveness ground, the County would have to either directly subsidize a

religious school, church or institution, or, a religious institution must be acting as a governmental agency. *See Lynch,* 465 U.S. at 685, 104 S.Ct. at 1365. In the instant matter, there is no direct subsidy of church sponsored school, college or religious institution. In addition, the instant case does not present a *Grendel's Den* scenario where a religious institution is allowed to have direct and controlling authority of a government activity. In all, there is neither the administrative involvement nor political divisiveness of a degree to support this court finding excessive entanglement.

### STATE CONSTITUTIONAL CLAIMS

■ The complaint also asks for relief under the provisions of California Constitution Article I, section 4 and Article XVI, section 5. California courts have utilized the three prong *Lemon* test in analyzing alleged violations of section 5 of Article I, the state's parallel version of the U.S. Constitution's establishment clause. *Fox v. City of Los Angeles,* 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978); *County of Los Angeles v. Hollinger,* 221 Cal.App. 2d 154, 34 Cal.Rptr. 387 (1963). As such, the above analysis of the First Amendment's establishment clause applies equally to section 5.

Furthermore, the recent case of *Okrand v. City of Los Angeles,* 207 Cal.App.3d 566, 254 Cal.Rptr. 913 (C.A.Cal.) filed January 26, 1989 by the Second Appellate District Division Five, considered many of the federal cases cited herein and affirmed a trial court decision holding that the city does not violate the establishment of the religion clause of the United States and California Constitutions when it permits display of an unlit menorah located near a decorated Christmas tree in the rotunda of its city hall. It cited the historic and cultural val-

ue of this Katowitz menorah which was crafted in the 19th century and was later rescued from the Nazi Holocaust, and is now owned by Chabad, an Orthodox Jewish organization. The Court said: "The fact (the menorah) also has high religious significance to Jews does not mean that its display does not also provide cultural and educational development to the citizenry at large." *Okrand* at 574, 254 Cal.Rptr. 913. The menorah displayed in the rotunda was accompanied by a sign describing the history of the Katowitz Menorah.[8]

In addition to the general establishment clause prohibition, section 4 has also been interpreted as disallowing "preference" for a religion or among religions. *Fox,* 22 Cal.3d at 796, 150 Cal.Rptr. 867, 587 P.2d 663. The California Constitution does not require, however, "that each religion always be represented." *Id.* " '[T]he government may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content. *Allen v. Hickel,* 424 F.2d 944 (D.C.Cir.1970)' " *Fox,* 22 Cal.3d at 798, 150 Cal.Rptr. 867, 587 P.2d 663; *see also Okrand,* 207 Cal.App.3d at 573, 254 Cal.Rptr. 913. As discussed fully above, the statuary park in question in effect has historical, cultural and artistic value. As such, the park, dedicated to world peace, would have no more demonstrative preference for a religion i.e. Christianity, than a government-owned museum displaying art with "spiritual content."

Section 5 of Article XVI of the California Constitution prevents any public resources to support "any creed, church or sectarian purpose." "The power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes." *California Educational Facility Authori-*

---

**8.** This sign read as follows:

THE KATOWITZ MENORAH

The 'FREEDOM MENORAH' was rescued from the flames of the Holocaust. Its former home was the Great Synagogue of Katowitz in Poland.

The Menorah was commissioned in the early 1800's. The eagles on the top of the Menorah are the 'Hapsburg Eagles.' They were incorpo-

rated in the design of the Menorah in appreciation and gratitude for the protection that the Hapsburg Empire granted the Jewish populance [sic].

The Menorah was crafted in Italy in the Italian Renaissance style. Each piece of the Menorah was individually hand-carved. The Menorah was designed, crafted and signed by the Artist 'Rosso.' "

*ty v. Priest,* 12 Cal.3d 593, 604, 116 Cal. Rptr. 361, 526 P.2d 513 (1974).

As detailed above, no direct aid, money or otherwise, goes *directly* to support religion in this case, nor has the County exhibited an impermissible sectarian purpose. Any incidental benefit to religion derived from this park compares to the minimal benefit derived from religious art presented in a government owned museum.

As such, I find that San Bernardino County's ownership of Antone Martin Memorial Park does not violate either Article I, section 4 nor Article XVI, section 5 of the California Constitution.

### CONCLUSION

In light of the foregoing, the court concludes as a matter of law that the ownership and maintenance by the County of San Bernardino of a public park containing a collection of permanent statuary depicting replicas of New Testament figures does not violate the establishment clause of the United States Constitution nor does it violate either Article I, section 4 or Article XVI, section 5 of the California Constitution. A judgment will be entered in accordance with this opinion.

SO ORDERED.

Pursuant to the Memorandum of Opinion filed concurrently herewith, the Court being advised,

IT IS ORDERED AND ADJUDGED as follows:

Plaintiffs' request for an injunction prohibiting the ownership, maintenance and display by the defendants and the County of San Bernardino of the park named Antone Martin Memorial Park, together with its collection of Biblical statues and tableaus is denied, PROVIDED HOWEVER, the defendants comply with the following terms and conditions:

a. That a suitable disclaimer be prominently displayed at the entrance of the park in letters readable from a distance of 10 feet with a disclaimer which reads substantially as follows:

"This park was created by sculptor Antone Martin as a Shrine of Peace. Upon his death, his heirs devised the park and its statutes to the County of San Bernardino as a memorial to the sculptor and for the artistic and cultural appreciation of those who may want to visit the park. The park does not constitute an endorsement by the County of San Bernardino of any religion or religious doctrine."

b. The County of San Bernardino shall remove all racks and other receptacles which provide space for the positioning of brochures or magazines from outside sources which may be used to convey the notion to the public that the distributors of such papers have a connection with the park. Nothing in this provision shall prevent the County from distributing its own literature describing and advertising the park.

The Court shall retain continuing jurisdiction of this matter, pursuant to its equitable power to assure compliance with the conditions set forth herein.