Ruby HEWITT; Ralph Winant; Jerry Weitzman; Darrell Barker and Dennis Molloy, Plaintiffs–Appellants,

v.

John JOYNER; Robert L. Hammock; Jon D. Mikels; Barbara C. Riordan; and Larry Walker, in their official capacities as members of the San Bernardino County Board of Supervisors; Yucca Valley Parks and Recreation District, Defendants–Appellees.

No. 89–55199.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1990.

Decided July 31, 1991.

Carol A. Sobel, ACLU Foundation of Southern Cal., Los Angeles, Cal., for plaintiffs-appellants.

David L. Llewellyn, Jr., Sacramento, Cal., for defendants-appellees.

Douglas E. Mirell, Los Angeles, Cal., for amicus curiae American Jewish Congress.

Daron L. Tooch, Los Angeles, Cal., for amicus curiae Anti–Defamation League of B'nai B'rith.

Before FERGUSON, NORRIS and THOMPSON, Circuit Judges.

FERGUSON, Circuit Judge:

Plaintiffs-appellants, five residents of San Bernardino County, appeal the district court's judgment in favor of the defendants-appellees after a one-day bench trial. The defendants are the Yucca Valley Parks and Recreation District and members of the San Bernardino County Board of Super-

visors.[1] The plaintiffs sought declaratory and injunctive relief, contending that the County's ownership and maintenance of a public park containing exclusively immovable religious statuary depicting scenes from the New Testament violate the Establishment Clause of the first amendment of the United States Constitution and analogous provisions of the California Constitution. We hold that the district court erred in finding that the County's ownership of the park does not violate the California Constitution, and reverse. We do not adjudicate the federal issues.

## I.

San Bernardino County currently owns and maintains Antone Martin Memorial Park, a 3.5 acre park located in Yucca Valley, a county subdivision. The park contains 36 immovable statues and tableaus which are scattered among indigenous Joshua trees and cottonwoods. The statues are arranged in several groupings which depict the story of the life of Christ as told in the New Testament. They are made of solid concrete and are anchored to the ground by an underground block of cement. Each statue weighs from 4 to 16 tons, except for the Last Supper Facade, which is estimated to weigh 125 tons.

A brochure at the park states that the park was "[s]tarted in 1951 by the Reverend Eddie Garver, the 'Desert Parson' of Yucca Valley, with one huge statue depicting Christ." Antone Martin lived on the park site from 1953 until his death in 1961. During that time, he created the larger-than-life white concrete statuary representing various biblical scenes.[2] Upon his death, his heirs donated the property to the County by a deed containing a reversionary clause requiring that the County preserve the biblical statuary at the park. Since 1961, the County has maintained the property as a public park.

After accepting the park, the County dedicated it as Desert Christ Park, printed brochures which identified each of the statuary scenes by reference to Bible passages, and put an ad in the telephone directory advertising the park as a "World Famous Theme Park ... depicting life of Christ." Picnic tables, parking and restrooms have been provided for the public's use. The Yucca Valley Parks and Recreation District is responsible for maintenance of the park, and spends $5,500 annually on the park. A portion of this money comes from the San Bernardino County General Fund.

The park property adjoins that of the Evangelical Free Church. Statues by Antone Martin are also located on church grounds and are described in the County's brochure as part of the park.[3] In fact, the largest of the park's statues, the Last Supper tableau, straddles the property line of the church and the park. A large cross located on church property overlooks the park from a hillside. Until this litigation was initiated, the County had made no effort to demarcate the park's property line. In addition to the official brochure, there are signs and plaques at the park to inform visitors about the statuary and its founder.[4]

On November 12, 1987, the plaintiffs, all residents of San Bernardino County, filed a complaint against the County alleging its ownership and maintenance of the park violated the state and federal constitutions. Less than one week later, the County wrote to the pastor of the adjoining church explaining its proposed strategical response

---

1. This opinion will refer to the defendants collectively as the "County."

2. Photographs of the statuary which were admitted as exhibits in the district court are reproduced here in the appendix to this opinion.

3. The brochure describes statuary scenes numbers 11, "On the Third Day," and 12, "Christ's Blessing[] The First Statue," which the County concedes are on church property.

4. One plaque at the park states, "Antone Martin, Sculptor[:] Desert Christ Park was conceived and brought into being through his dedication, faith, sincerity and application." Another sign, located at the entrance to the park, reads in part, "In order to perpetuate and protect the biblical artistry in statuary created by Antone Martin, these acres were given to the Yucca Valley Parks & Recreation District by Fred Storey and Ted Turling."

to the suit. The County outlined four steps it would take to "blunt" this litigation:

1) rename and change the signs on the park to the Antone Martin Memorial Park; [5]

2) construct a four-foot fence along the property line common to the park and the church;

3) provide more historical information at the park for visitors; and

4) rewrite the brochure to emphasize historical, instead of biblical, elements.

New signs were put up, a low chain-link fence was run along a portion of the park-church border, and a new brochure was printed. The new brochure eliminated direct citations to the Bible, but retained descriptions of the statuary, e.g., "Sermon on the Mount" and "Garden of Gethsemane." In fine print, the new brochure states:

Antone Martin was not a particularly religious man and was adamant that the park not be used for any religious purposes. According to those who knew him he picked biblical characters to sculpt as he felt they best portrayed the 'peace on earth' sentiment he was trying to impress on his fellow man.

At the time of trial, the phonebook ad remained unchanged.

The district court held a bench trial and heard testimony from six witnesses: the photographer that produced the plaintiffs' exhibits, two plaintiffs, two experts in religious studies, and the director of the Yucca Valley Parks and Recreation District. Both experts testified that the statues were distinctly religious symbols of the Protestant–Christian faith. Except for the park director, all of the witnesses stated that they perceived a religious message when they visited the park. No evidence was given regarding the circumstances surrounding the park's donation. Instead, the trial focused solely on the current condition of the property and the County's asserted secular purposes in owning the park.

In a published opinion, the district court ruled that the County's ownership and maintenance of the park did not violate the Establishment Clause of the federal constitution. *Hewitt v. Joyner*, 705 F.Supp. 1443, 1447–52 (C.D.Cal.1989). The court then summarily dismissed the plaintiffs' state constitutional claims on the grounds that the state constitution's provisions did not require a different result. *Id.* at 1452–53. The plaintiffs timely appealed the judgment against them.

## II.

The district court found that the five plaintiffs, all residents of San Bernardino County, had standing to challenge the County's ownership and maintenance of the park. The court based this finding on two grounds. First, two of the plaintiffs demonstrated an injury in fact by the curtailment of their right to use a public park. *Hewitt*, 705 F.Supp. at 1445–46 (citing *ACLU of Georgia v. Rabun County*, 698 F.2d 1098 (11th Cir.1983)). Secondly, as county taxpayers, the plaintiffs had a right to challenge the constitutionality of the government's use of their tax monies. *Id.* at 1446 (citing *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)). At trial, the plaintiffs testified that they paid local taxes and the director of the park district admitted that the district's budget was partially supported by the San Bernardino County General Fund.

We affirm the district court's determination that the plaintiffs have standing to challenge the County's ownership of the park. Other circuits have recognized that when a plaintiff alleges that the government has unconstitutionally aligned itself with religion, standing may be based on finding that the plaintiff has been injured due to his or her not being able to freely use public areas. *See, e.g., ACLU of Illinois v. City of St. Charles*, 794 F.2d 265, 267–269 (7th Cir.) (plaintiffs had standing when they were so offended by a government-owned cross that they departed from their usual route to avoid it), *cert. denied*, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403

---

**5.** However, subsequent County action required that the former name of the park, Desert Christ, be retained in parentheses on all signs for ten years.

(1986); *ACLU of Georgia v. Rabun County*, 698 F.2d 1098, 1107–08 (11th Cir.1983) (standing found where plaintiffs stopped using state park which included an illuminated cross).

## III.

The plaintiffs contend that the district court erred in its analysis of both their federal and state constitutional claims. It is well-established that this court should avoid adjudication of federal constitutional claims when alternative state grounds are available. *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455–56, 53 L.Ed. 753 (1909). "[F]ederal constitutional issues should be avoided even when the alternative ground is one of state constitutional law." *Carreras v. City of Anaheim*, 768 F.2d 1039, 1042–43 (9th Cir.1985) (citations omitted). We find that the County's ownership of the park violates the California Constitution, and therefore we do not address the plaintiffs' federal constitutional claims.

A district court's interpretation of state law is reviewed de novo. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). "When interpreting state law, a federal court is bound by the decision of the highest state court." *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir.1990) (citing *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir.1986), *reh'g denied, op. modified*, 810 F.2d 1517 (9th Cir.1987)). Although the California courts have never addressed the precise issues presented in this case, "[f]ederal courts are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controver-

sy." *Paul v. Watchtower Bible and Tract Soc. of New York*, 819 F.2d 875, 879 (9th Cir.), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). When the state supreme court has not spoken on an issue, we must determine what result the court would reach based on state appellate court opinions, statutes and treatises. *Kirkland*, 915 F.2d at 1239; *Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir.) (citations omitted), *cert. denied*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).

## IV.

The district court found that the California Constitution's provisions addressing the separation of church and state were substantially similar to the Establishment Clause of the United States Constitution. *Hewitt*, 705 F.Supp. at 1452–53. The court summarily concluded that the state constitution was not violated. *Id.* We find that the trial court misread the California Constitution and the state court opinions interpreting it, and therefore we reverse.

The California Constitution contains three separate provisions pertaining to the separation of church and state. Based on these provisions, the state courts have developed a body of law regarding the appropriate relationship between religion and the state which is independent from that of the federal courts. The first provision is article I, section 4, the language of which is very similar to the federal Establishment Clause.[6] However, it also provides that the state may not discriminate between religions or prefer one religion over another. Cal. Const. art. I, § 4. The second provision, article XVI, section 5, strictly prohibits any governmental support for religious purposes.[7] Cal. Const. art. XVI, § 5. Fi-

---

6. Section 4 states in full:
 Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion.
 A person is not incompetent to be a witness or juror because of his or her opinions on religious beliefs.
 Cal. Const. art. I, § 4.

7. This section states in full:
 Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, or hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of

nally, article IX, section 8 prohibits the use of public money for religious schools. Cal. Const. art. IX, § 8. These sections are "proof of the framers' intent to build a Jeffersonian wall of separation between church and state in California." *Sands v. Morongo Unified School Dist.*, 53 Cal.3d 863, 809 P.2d 809, 281 Cal.Rptr. 34 (Sup.Ct. 1991) (Mosk, J., concurring).

We find that the County's ownership of the Antone Martin Memorial Park violates both article I, section 4 and article XVI, section 5 of the California Constitution.

### A.

■ In its discussion of the California Constitution, the district court here stated:

California courts have utilized the three prong *Lemon* [*v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)] test in analyzing alleged violations of section 5 of Article 1, the state's parallel version of the U.S. Constitution's establishment clause. As such, the above analysis of the First Amendment's establishment clause applies equally to section 5.

*Hewitt*, 705 F.Supp. at 1452 (citing *Fox v. City of Los Angeles*, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867 (1978); *County of Los Angeles v. Hollinger*, 221 Cal. App.2d 154, 34 Cal.Rptr. 387 (1963)).[8] Contrary to the district court's statement, the state courts have not limited their interpretation of the California Constitution to the United States Supreme Court's interpretation of the federal constitution.[9]

Article I, section 4 of the California Constitution contains both a prohibition on state establishment of religion and a no preference clause. A plurality of the California Supreme Court recently noted:

[t]he Attorney General of this state has observed that "it would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion" than that found in the "no preference" clause, and California courts have interpreted the clause as being more protective of the principle of separation than the federal guarantee.

*Sands v. Morongo Unified School Dist.*, 53 Cal.3d 863, 809 P.2d 809, 281 Cal.Rptr. 34 (Sup.Ct.1991) (Kennard, J.) (quoting 25 Op. Cal.Atty.Gen. 316, 319 (1955) and citing *Fox v. City of Los Angeles*, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867 (1978)).[10] The no preference clause has been found to prohibit any appearance that the government has allied itself with one specific religion. *Id.* In *Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 254 Cal.Rptr. 913 (1989), a state appellate court noted the similarity in language but difference in application of the state provision and the fed-

personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 3 of Article XVI.
Cal. Const. art. XVI, § 5. Section 3 of Article XVI allows state money to be given to private institutions to aid orphans and other needy persons.

**8.** The district court erroneously referred to section 5 as the relevant section. However, section 5 of article I mandates that the state military is subordinate to the civil power of the state. Cal. Const. art. I, § 5.

**9.** In fact, neither the *Fox v. City of Los Angeles* nor the *County of Los Angeles v. Hollinger* majority opinions mentioned the Supreme Court's *Lemon* test. *See Fox*, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867; *Hollinger*, 221 Cal. App.2d 154, 34 Cal.Rptr. 387. In *Fox*, the *Lemon* test is mentioned only in a concurring opin-

ion by Chief Justice Bird in which she found that the city's display of a cross also violated the establishment clause of the federal constitution. *Fox*, 22 Cal.3d at 806–12, 587 P.2d at 672–76, 150 Cal.Rptr. at 876–80. The *Hollinger* opinion could not have relied on the Supreme Court's opinion in *Lemon* because it was issued eight years before the federal opinion.

**10.** In *Morongo*, five of the seven state supreme court justices held that religious invocations and benedictions at public high school graduation ceremonies violated the U.S. Constitution. Justice Kennard wrote the opinion for the court and also held that the graduation prayers violated the California Constitution. Two justices concurred in that part of her opinion addressing the state constitution. Of the other four justices, two thought that the court should not reach the state constitutional issue, while two found that the prayers did not violate either the state or federal constitution.

eral constitution. " 'California's constitutional provisions are more comprehensive than those of the federal [c]onstitution.' " *Id.* at 571, 254 Cal.Rptr. at 916 (quoting *Bennett v. Livermore Unified School Dist.*, 193 Cal.App.3d 1012, 1016, 238 Cal. Rptr. 819 (1987) (citations omitted)).

The *Okrand* court did recognize that an analysis under the state constitution frequently produces the same results as an analysis under the federal constitution. Therefore, it held that because there are few state cases addressing free exercise and establishment of religion, a state court "may 'also consult principles of federal cases as they seem compelling guides to uncharted state grounds.' " *Id.* at 572, 254 Cal.Rptr. at 916 (quoting *Feminist Women's Health Center, Inc. v. Philibosian*, 157 Cal.App.3d 1076, 1086, 203 Cal.Rptr. 918 (1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985)). The court then incorporated the *Lemon* test into its constitutional analysis but specifically noted that California courts should not view the *Lemon* test as absolute " 'but as a touchstone with which to identify instances where the objectives of the establishment clause have been compromised.' " *Id.* at 573 n. 6, 254 Cal.Rptr. at 917 n. 6 (quoting *Johnson v. Huntington Beach Union High School Dist.*, 68 Cal.App.3d 1, 11, 137 Cal.Rptr. 43, *cert. denied*, 434 U.S. 877, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977)). Having established that the California Constitution's provision prohibiting governmental establishment or preference of religion is not limited by the United States Constitution, we examine how the state courts have applied this provision.

### B.

■ The California courts have interpreted the no preference clause in article I, section 4 to require that not only may a governmental body not prefer one religion over another, it also may not *appear* to be acting preferentially. Two recent opinions by the California courts define the state constitutional limits on government-sponsored religious displays. In *Fox*, the California Supreme Court held that the City of

Los Angeles may not light a cross on city hall during Christmas and Easter; while in *Okrand*, the appellate court permitted the city to display an unlit menorah in the city hall rotunda.

In *Fox*, the court first noted that the United States Supreme Court's opinions addressing permissible religious displays under the federal constitution were not clear. *Fox*, 22 Cal.3d at 795, 587 P.2d at 664, 150 Cal.Rptr. at 868. Turning to the state constitution, the court applied the no preference clause of section 4 and ruled:

[i]n the California Constitution there is no requirement that each religion always be represented. To illuminate only the Latin cross, however, does seem preferential when comparable recognition of religious symbols is impracticable.

*Id.* at 797, 587 P.2d at 665, 150 Cal.Rptr. at 869. The court distinguished its earlier decision *Evans v. Selma Union High School Dist.*, 193 Cal. 54, 222 P. 801 (1924), in which a school library's decision to purchase a copy of the King James Bible was found to be constitutional. The *Fox* court noted "[l]ibrarians quite easily can offset a potential for preference, but a city hall tower is much less tractable than are shelves of a school library." *Fox*, 22 Cal.3d at 797, 587 P.2d at 666, 150 Cal. Rptr. at 870.

In *Fox*, the City of Los Angeles contended that because the cross-lighting had occurred for 30 years without citizen complaint, obviously the public did not perceive any preference on the part of the city. *Id.* The court rejected this argument, acknowledging that the silence of religious minorities may signal something quite different from disinterest. *Id.* Finally, the city offered government reports which implied that the cross had been put up, not for religious reasons, but rather as a " 'symbol of the spirit of peace and good fellowship toward all mankind on an interfaith basis, particularly toward the eastern nations in Europe.' " *Id.* at 798, 587 P.2d at 666, 150 Cal.Rptr. at 870 (citation omitted). Again, the court found such an assertion meritless. It refused to suspend belief and accept the city's secular explanation given

the clear religious meaning of the cross. "Easter crosses differ from Easter bunnies, just as Christmas crosses differ from Christmas trees and Santa Claus." *Id.*

Conversely, in *Okrand,* the court permitted the display of an unlit menorah in the rotunda of the Los Angeles City Hall. The display was part of an exhibit which included a Christmas tree and made "no 'effort to express some kind of subtle governmental advocacy of a particular religious message.'" *Okrand,* 207 Cal.App.3d at 574, 254 Cal.Rptr. at 918 (quoting *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 1362–63, 79 L.Ed.2d 604 (1984)). After finding that the display satisfied the three prongs of the *Lemon* test, the *Okrand* court looked to the California Constitution to determine whether the display violated the "preference" test as articulated in *Fox. Id.* at 579, 254 Cal.Rptr. at 921. "That is, we are to inquire whether the governmental action exhibits a preference for a religion or a religious belief." *Id.* The *Okrand* court found the display did not exhibit a preference for one religion because there was recognition of other religious symbols; the display of the menorah did not dominate the exhibit; the particular menorah displayed (the Katowitz Menorah saved from the Holocaust) was more a museum piece than a symbol of religious worship; and the "menorah differs in degree from the Latin cross in terms of its significance as a symbol of religion." *Id.* at 579–80, 254 Cal.Rptr. at 921–922. Therefore, the court concluded that the city's display of the unlit menorah was permissible under both the California and United States Constitutions.

■ We must apply the legal principles articulated by these decisions to the case at bar. The district court here repeatedly quoted language from Supreme Court cases that museums which display religious art do not violate the Establishment Clause. *Hewitt,* 705 F.Supp. at 1450–52. It concluded that the "[p]ark, as such, is more like a museum in content and display, than a public park." *Id.* at 1450. However, the essential difference between the County's park and a public museum is pivotal to our conclusion that the County's ownership violates the California constitution.

"A typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Lynch* at 692, 104 S.Ct. at 1369. However, every religious display that is put in an "artistic" form, such as painting or sculpture, instead of the "mannequin-like" form of the creche or cross is not saved from First Amendment scrutiny. While the majority of cases have concerned holiday displays of crosses or creches, e.g., *Fox,* 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867; *Okrand,* 207 Cal.App.3d 566, 254 Cal.Rptr. 913, few courts have tackled the more difficult problem of religious artwork.

A "typical" museum, like the city hall in *Okrand,* may display a variety of artwork. The Antone Martin Memorial Park is restricted to only the artwork already in existence. Unlike the library considered by the state supreme court in *Evans,* the County here may not "easily ... offset a potential for preference." *Fox,* 22 Cal.3d at 797, 587 P.2d at 666, 150 Cal.Rptr. at 870. In addition, the religious nature of the statues is emphasized by their surroundings—the neighboring church and hill-side cross. The effect and message of the park is a religious one.

The *Fox* court's decision relied on a fact-specific analysis of the physical limits of the display in question. Additionally, the *Okrand* court expressed approval of the revolving nature of the city hall display and its diversity. *Okrand,* 207 Cal.App.3d at 574, 254 Cal.Rptr. at 918. The case before us presents constraints, similar to those in *Fox,* on the display of secular or non-Christian religious pieces. The park's deed requires that the statuary not be altered. Because of their dominance of the landscape, the statues are more symbols of worship than museum pieces. Unlike a museum or a library which is free to add or subtract from its collection, the Antone Martin Memorial Park is a static collection of Christian symbols displayed and maintained by the government.

■ Here, the County asserts that it accepted and has maintained the park for tourism reasons and to memorialize a locally well-known artist. The plaintiffs have presented no evidence to contradict the defendant's asserted secular purposes. However, the no preference clause is not satisfied by a secular purpose. Regardless of the County's intentions, it has violated the California Constitution by appearing to endorse the religious message of Antone Martin's sculptures.

Finally, the district court noted with approval the efforts taken by the County to minimize any religious message or indication of preference on the part of the County. *Hewitt,* 705 F.Supp. at 1450.

> County officials saw to it that none of the statues contained any labels identifying the depiction or linking any likeness to the Christian religion. No signs were in evidence anywhere that would suggest county endorsement of a religion. No religious meetings of any kind were permitted on the area and the name of the park was changed to one which attempted to make clear that the property was a memorial to the sculptor and his theme of peace, and not a place dedicated to one religion.

*Id.* at 1448.[11] We do not find these facts persuasive.

■ The allegedly great efforts taken by the County to ensure that a religious message was not perceived by the public are unsuccessful. The park's name change, the new fence and the revised brochure do not change the clear religious message of the park. The statues are exclusively of biblical figures and scenes from the New Testament. Moreover, during the vast majority of the County's ownership, the park was allowed to appear as an extension of the nearby church (or, alternatively, the hillside cross was viewed as part of the public park), the brochures contained citations to passages in the Bible, and the park was named and advertised as "Desert Christ Park." "The 'history and ubiquity'

of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *County of Allegheny v. A.C.L.U.,* 492 U.S. 573, 109 S.Ct. 3086, 3121, 106 L.Ed.2d 472 (O'Connor, J., concurring). When viewed in its historical context, the County's ownership of the park depicts a government-endorsement of the Christian faith.

We conclude that the County's ownership of the Antone Martin Memorial Park violates article I, section 4 of the California Constitution based on the clear religious message of the statuary, the static nature of the display, and the history of the County's ownership.

### C.

■ In addition to the no preference clause in Article I, section 4, the California Constitution includes a broad ban on the use of public property or funds to support religious purposes. Cal. Const. art. XVI, § 5. The state courts have interpreted this section broadly. Specifically, the courts have found that a municipal body's legitimate secular interest in attracting tourist dollars can not outweigh the constitution's strict ban on governmental aid to religion. *See County of Los Angeles v. Hollinger,* 221 Cal.App.2d 154, 34 Cal.Rptr. 387 (1963); *Frohliger v. Richardson,* 63 Cal.App. 209, 218 P. 497 (1923). We find that the state constitution forbids taxpayer support of Antone Martin's religious statuary.

In *County of Los Angeles v. Hollinger,* a state appellate court refused to enforce a contract between Los Angeles County and the Bethlehem Star Parade Association to film the Association's annual Christmas parade. The parade was composed of floats representing scenes from the Old and New Testament of the Bible. The Association's stated purpose was "to 'restore the original significance of Christmas.'" *Hollinger,* 221 Cal.App.2d at 159, 34 Cal.Rptr. at 390 (citation omitted). Because the parade was

---

11. The district court errs when it states, "A sign was erected disclaiming any intention to maintain the park for religious purposes." *Hewitt,*

705 F.Supp. at 1445. In fact, the erection of a sign was part of the district court's order. *Id.* at 1453.

a tourist attraction, the County Board of Supervisors wanted to distribute a color film of the parade to further increase the number of tourists to the area. Acting pursuant to California law authorizing publication of city attractions, the County agreed to pay the Association to film its parade and to circulate the film for advertising purposes. *Id.* at 156–57, 34 Cal.Rptr. at 389. The purpose expressed in the contract was to publicize the attractions of the County. Based on this information, the appellate court concluded:

> [A]lthough publicizing the attractions of the county is a proper secular purpose authorized by section 26100 of the Government Code, nonetheless this authority necessarily is limited by section 30 of Article IV of the California Constitution which provides in part: "Neither the Legislature, nor any county, ... shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, ..."

*Id.* at 158, 34 Cal.Rptr. at 390.

The County argued that the Association's reasons for presenting the parade should be irrelevant to the court's analysis when there was no evidence that the government's filming of the parade was religiously motivated. The court did not find this logic persuasive. It distinguished this case, where the religious parade was the sole subject of the film, from one in which a variety of local attractions were highlighted. *Id.* at 162, 34 Cal.Rptr. at 392.

> It is common knowledge that there are a great many other religious spectacles, festivals and parades, conducted and promoted by other groups, that also attract visitors to the county. Each of these groups doubtless would be willing, if they did not in fact insist upon their equal right, to assist in advertising the county by filming and distributing nationally at county expense their own functions. The strife likely to be engendered among such competing groups, no one of which could be decreed to be more meritorious than any of the others, is the precise danger which, ... these constitu-

tional guaranties were designed to eliminate.

*Id.* In rejecting the County's argument, the court relied on *Frohliger v. Richardson,* 63 Cal.App. 209, 217, 218 P. 497 (1923), where public financing to restore the San Diego Mission was found unconstitutional.

■ The *Frohliger* opinion is a strong statement by the California courts that the existence of a legitimate secular purpose will not redeem otherwise prohibited governmental aid to religion. Holding that public money could not be used to restore the San Diego Mission, the court did not attempt to refute the motivations proffered by the government.

> We concede that the California missions are of historical and educational interest from a cultural and literary standpoint, but they approach no such classification as would make them the basis of the state's bounty or the subject of legislative appropriation in the guise of public interest, public good, or public welfare.
>
> ....
>
> We have endeavored to make it clear that we are in sympathy with the meritorious movement having for its object the restoration and preservation of the missions, but no matter how praiseworthy we may believe such efforts to be, we must say that, in our opinion, the state constitution forbids that such work be done at the expense of the taxpayers. We believe that the act of the legislature under consideration is in manifest violation of ... the state constitution....

*Id.* at 217, 218 P. at 500. The *Frohliger* court saw the state's aid to the mission as an invitation to other religious groups "seeking money for restoration of old buildings, upon the ground that they were of historical and educational interest and therefore of public concern." *Id.*

■ Additionally, it is not a defense to the California Constitution's prohibition on governmental aid of religion, that the amount of money expended on the Antone Martin Memorial Park is relatively small. As Justice Bird wrote in her concurrence in *Fox:*

Those who argue that the amount of taxpayer funds expended to light the cross is so minimal as to be beneath this court's notice, overlook two important considerations. First, article XVI, section 5 admits of no de minimis exception. The language is explicit: No "city ... shall ever ... pay from any public fund whatever, or grant anything to or in aid of any religious sect...." Secondly, the prohibitions of article XVI, section 5 would come into play even if no funds were expended. The ban is on aid to religion in *any* form.

*Fox*, 22 Cal.3d at 806, 587 P.2d at 671–72, 150 Cal.Rptr. at 875–76 (Bird, J., concurring) (emphasis in original).

It is uncontested that the Antone Martin Memorial Park attracts visitors to Yucca Valley and San Bernardino County. The County seeks to encourage this tourism by advertising the park in the phonebook, by printing brochures and by maintaining the park grounds. We do not dispute the County's assertion that the park is valued for its ability to attract tourists. However, the California Constitution forbids the County's use of a religious statuary park to achieve a secular goal, particularly, where, as here, the government's publicity of the park focuses on the religious aspects of the statues.[12] As noted in *Hollinger*, there may be many other religious groups in San Bernardino County which would appreciate government sponsorship of their religious parks or cemeteries. The California people have written their constitution to guard against exactly this type of situation.

■ More recently, in *California Teachers Assn. v. Riles*, 29 Cal.3d 794, 632 P.2d 953, 176 Cal.Rptr. 300 (1981), the California Supreme Court applied article XVI, section 5, and ruled that it was unconstitutional for state schools to lend textbooks to parochial schools. This ruling was contrary to decisions by the United States Supreme Court in similar cases. The state supreme court developed a two-part test for determining if governmental aid violated the state constitution. *Id.* at 809, 632

P.2d at 962, 176 Cal.Rptr. at 309. "[W]e consider first whether the aid is direct or indirect, and second whether the nature of the aid is substantial or incidental." *Sands v. Morongo Unified School Dist.*, 53 Cal.3d 863, 809 P.2d 809, 281 Cal.Rptr. 34 (Sup.Ct. 1991) (Mosk, J., concurring) (citing Note, *Rebuilding the Wall Between Church and State: Public Sponsorship of Religious Displays Under the Federal and California Constitutions*, 37 Hasting L.J. 499, 532 (1986)).

We find that the County's ownership of the Antone Martin Memorial Park also violates the state constitution under the test set forth in *Riles*. The County's support of the park is clearly direct. It holds the deed to the park and pays for its maintenance. The second prong of the test asks whether the support given by the County more than incidentally benefits the religious view symbolized by the park's statuary. The plaintiffs' testimony at trial undermines any argument that the government support to religion here is only incidental. Each plaintiff was surprised and disturbed by the apparent endorsement the County was giving to the religious message of Antone Martin's statues. Antone Martin created a religious park, the only change that has been made since his death is that now the taxpayers of San Bernardino County pay for the park's services.

We hold that the County has violated article XVI, section 5, by its ownership and maintenance of the Antone Martin Memorial Park.

## V.

■ The plaintiffs request attorney fees under 42 U.S.C. § 1988, which grants appellate courts discretionary power to order attorney fees. "A prevailing [civil rights] plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (quotations omitted). The fact that

---

**12.** Contrary to the County's apparent belief, many people do not consider the events described in the bible regarding the death of Jesus Christ "historical."

we base our decision on state, rather than federal, grounds does not constitute such a special circumstance. *See Carreras v. City of Anaheim*, 768 F.2d 1039, 1050 (9th Cir.1985) (fee award appropriate where plaintiff prevails on state law claim based on "a common nucleus of operative fact with a substantial federal claim"). We therefore instruct the trial court on remand to consider appellants' fee request.

## VI.

 In its brief, the County argues, "[t]here is no constitutional formulation that religious art inside a museum is lawful preservation but outside a museum is unlawful establishment of religion." Their argument highlights the difficulty of this case. Neither the California nor the United States Constitution prohibit governments from preserving their cultural and artistic heritage. However, the argument that a religious display is art or a tourist attraction will not protect the display from the restrictions on government-sponsored religion which the people of California have put in their constitution.

Given the factual and historical context of the County's ownership of Antone Martin Memorial Park, we find that the County has violated both article I, section 4 and article XVI, section 5 of the California Constitution. Therefore, we REVERSE the district court's judgment and REMAND to the district court directing that it grant the appellants' petition for declaratory and injunctive relief.

...TONE MARTIN, SCULPTOR
DESERT CHRIST PARK WAS
CONCEIVED AND BROUGHT INTO
...ING THROUGH HIS DEDICATION
...TH, SINCERITY AND APPLICATION

1578

1580

