[Civ. No. 26868.   Second Dist., Div. Two.   Oct. 14, 1963.]

COUNTY OF LOS ANGELES et al., Plaintiffs and Appellants, v. ROSCOE HOLLINGER, as County Auditor, etc., Defendant and Respondent.

Harold W. Kennedy, County Counsel, Joel R. Bennett, Deputy County Counsel, and H. M. Langworthy for Plaintiffs and Appellants.

Demetriou & Del Guercio and Richard A. Del Guercio for Defendant and Respondent.

Mitchel J. Ezer and Hillel Chodos as Amici Curiae on behalf of Defendant and Respondent.

HERNDON, J.—The County of Los Angeles and Bethlehem Star Parade Association, a corporation, hereinafter referred to, respectively, as the "County" and the "Association," appeal from the judgment of dismissal which was entered after they had failed to amend their petition seeking a writ of mandate within the time allowed by the order sustaining respondent's general demurrer.

By their petition, appellants sought the issuance of a writ requiring respondent, the Auditor of Los Angeles County, to pay a claim filed by the Association, and approved by a resolution of the board of supervisors, arising out of a contract entered into between the Association and the County. Respondent's refusal to make the directed payment was based upon his

belief that the contract authorizing it is invalid and in excess of the powers of the County.

Being an order based upon the pleadings, the facts, of course, are not in dispute. The sole issue presented for our consideration is the correctness of the trial court's determination that this particular contract violated the provisions of our state and federal Constitutions relating to the separation of church and state.[1]

The articles and bylaws of the Association were attached to the petition as exhibits. From these it appears that the specific and primary purpose of the Association is "to restore the original significance of Christmas to the Holiday Season of the year through the presentation in Van Nuys, California, of a non-commercial religious parade made up of appropriate floats based on biblical scenes from both the Old and the New Testament." It also is recited that the Association shall have other powers, but these are specifically made incidental and subordinate to the primary purpose of the corporation.

The petition alleges that: "For the past fourteen years [the association] has produced and promoted ... in December of each year, an annual parade or pageant known as the Bethlehem Star Parade, said parade consisting of a number of floats depicting the life and times of Jesus Christ and of bands and other musical organizations playing various hymns, songs and other musical compositions constituting a part of the Christian heritage, ..."

The petition further alleges that this parade "annually attract[s] numerous people to the County of Los Angeles and result[s] in considerable free newspaper publicity about the County of Los Angeles;" and that the Board of Supervisors believes "that the number of people annually attracted to [the] County could be materially increased if a colored motion picture were taken of said parade and copies of said colored film were distributed and made available to civic and service groups and to other organizations outside of the State of California, and that said distribution would tend to exploit and make known the resources of the County and thereby increase its trade and commerce."

The board of supervisors, purporting to act pursuant to authority conferred by section 26100 of the Government

---

[1]The First and Fourteenth Amendments of the Constitution of the United States and section 30 of article IV of the Constitution of the State of California.

Code,[2] entered into a contract with the Association wherein the Association agreed (a) to photograph its own 1961 parade, (b) to prepare a colored motion picture film with at least five additional prints, and (c) to distribute these films on a loan basis to civic and service groups outside the State of California. Apparently all of these films are intended to remain the property of the Association, the contract providing only that if the master film is not of sufficient quality to justify the production and circulation of additional copies, the county will be obligated to pay only for the master film.

The contract provides no standard or method by which the contents of the film or its sound tract is to be regulated other than the requirement that the "films will carry information indicating that they have been made possible by the County of Los Angeles and will show sufficient footage at various intervals during the film so as to publicize Los Angeles County." In short, the Association apparently is expected to, and under the terms of the contract certainly is free to, present its message both visually and orally throughout the film so long as it is made clear that this message is being sponsored by the County of Los Angeles.

In consideration of the contractual provisions authorizing it thus to fulfill on a national basis the specific purpose for which it was organized, the Association agreed "to accept in full satisfaction therefor, the sum of $3,500.00, payable from the Exploitation Fund of the County for the fiscal year ending June 30, 1962, as follows: $500.00 upon execution of the contract; $2,000.00 on or about February 1, 1962; $1000.00 on or about December 31, 1962."

Following the execution of this contract by the parties

[2] "The board of supervisors may levy a special tax not to exceed four cents ($0.04) on the one hundred dollars ($100) of the assessed valuation of all property within the county for the purpose of inducing immigration to, and increasing the trade and commerce of, the county. The proceeds of the tax may be expended for any or all of the following uses:

"(a) Advertising, exploiting, and making known the resources of the county. (b) Exhibiting or advertising the agricultural, horticultural, viticultural, mineral, industrial, commercial, climatic, educational, recreational, artistic, musical, cultural, and other resources or advantages of the county. (c) Making plans and arrangements for a world's fair, trade fair, or other fair or exposition at which such resources may be exhibited. (d) Doing any of such work in cooperation with or jointly by contract with other agencies, associations, or corporations."

thereto on November 6, 1961, the Association filed its "Notice of Claim and Verified Report" on November 14, 1961, which succinctly stated: "The film production required pursuant to said contract will be performed strictly in accordance with the terms thereof by a qualified commercial film producer, who will film the 1961 Bethlehem Star Parade and will prepare a script for the sound tract of said film. The distribution of said film will be through a commercial film producer and in strict accordance with the terms of said contract. Said sum of $500.00 will be used only for the payment of expenses incurred or to be incurred in connection with said film."

Of the several rather obvious shortcomings of such a "report," perhaps the most outstanding is that, as heretofore noted, the "terms of the contract" are silent on the subject matter to be contained in the film or its "script" except to the very limited extent above set forth. It would appear, however, that since the Association's articles do not authorize it to engage in any activity not incidental to or connected with its primary purpose, the material visually and orally presented will be designed to encourage those who witness it "to restore the original significance of Christmas."

On this record, we conclude that the trial court was entirely correct in its ruling that, although publicizing the attractions of the county is a proper secular purpose authorized by section 26100 of the Government Code, nonetheless this authority necessarily is limited by section 30 of article IV of the California Constitution which provides in part: "Neither the Legislature, nor any county, ... shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, ..."

It cannot reasonably be denied that the specific purpose for which the Association was formed, and to which it is dedicated, is sectarian in character. As noted by our Supreme Court in *Evans* v. *Selma Union High School Dist.*, 193 Cal. 54, 57 [222 P. 801, 31 A.L.R. 1121]: "... the term 'sect' has frequently a broader signification, the activities of the followers of one faith being regarded as sectarian as related to those of the adherents of another." The question there considered was whether the King James version of the Bible was a book that was barred from school libraries because its character was "sectarian, partisan or denominational." The court concluded on page 60:

"If it were a fact that the King James version of the Bible was sought to be placed in the public school library to the

exclusion of all other versions of the Bible, or if it appeared to be a fact that this particular version or any other version of the Bible was to be used as a text-book for a prescribed course of study or to be used in reading therefrom to the pupils as a part of school exercises, it might then be well argued that such circumstances amounted to an implied declaration that this version was the only true version of the Scriptures, and that all others were false in so far as not in accord therewith. So used and under such circumstances, it might be justly claimed to be used as a basis for sectarian instruction. Such are not the facts in the case at bar. The mere act of purchasing a book to be added to the school library does not carry with it any implication of the adoption of the theory or dogma contained herein, or any approval of the book itself except as a work of literature fit to be included in a reference library. For aught that appears in the instant case the library in question may already contain copies of the Douai version of the Bible as well as copies of the Talmud, Koran, and teachings of Confucius.'' (See also *School District of Abington Township* v. *Schempp*, 374 U.S. 203, 223-224 [83 S.Ct. 1560, 10 L.Ed.2d 844, 859].)

In the instant case, the express and specific purpose of the Association is to ''restore the original significance of Christmas'' by the presentation of ''biblical scenes from both the Old and New Testament.'' Its membership is limited to persons ''interested in the purposes and objectives of this corporation in restoring the original significance of Christmas to the Holiday Season *and the emphasis upon the religious aspects of such season. . . .*'' (Emphasis added.)

The precise question here presented is whether or not a governmental body may expend funds collected by the exercise of its taxing powers in a fashion that so directly supports the religious beliefs and purposes of some of the many segments of our pluralistic society.

The basic views of the United States Supreme Court as to the concept of separation of church and state appear in the statement made in *Everson* v. *Board of Education*, 330 U.S. 1, 15-16 [67 S.Ct. 504, 91 L.Ed. 711, 723, 168 A.L.R. 1392, 1404], and repeated in *Illinois* ex rel. *McCollum* v. *Board of Education*, 333 U.S. 203, 210-211 [68 S.Ct. 461, 92 L.Ed. 649, 658, 2 A.L.R.2d 1338, 1347], as follows:

''The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. *Neither can pass laws which*

*aid one religion, aid all religions, or prefer one religion over another.* Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. *No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' " (Italics added.)

To those who would assert that the violation of the separation principle here presented is too minor to constitute a substantial violation, the words of James Madison, the author of the First Amendment to the United States Constitution quoted by Justice Black in delivering the opinion of the court in *Engel* v. *Vitale,* 370 U.S. 421, 436 [82 S.Ct. 1261, 8 L.Ed.2d 601, 611, 86 A.L.R.2d 1285, 1297], are apposite:

" '[I]t is proper to take alarm at the first experiment on our liberties ... Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?' "

▮ Appellants, in support of their contentions, argue strongly that because the board of supervisors has determined that a public purpose of a purely secular character will be promoted by the fulfillment of the contract, the sectarian nature of the organization that is to produce the films, determine their content and commentary (subject to certain minor rquirements unrelated to the religious matter itself), and own the finished product, is wholly irrelevant and immaterial.

This argument appears to have been fully answered in the following language from *Frohliger* v. *Richardson,* 63 Cal. App. 209, 217 [218 P. 497], (hearing denied), used by the court in passing upon the constitutionality of an appropriation to restore the San Diego Mission:

"Disregard of the constitutional bar would render the public treasury easy of access for the levying of tribute, under cover of appropriation acts, by sects of every denomination, and other organizations, seeking money for the restoration of old buildings, upon the ground that they were of historical and educational interest and therefore of public concern.

"We concede that the California missions are of historical and educational interest from a cultural and literary standpoint, but they approach no such classification as would make them the basis of the state's bounty or the subject of legislative appropriation in the guise of public interest, public good, or public welfare.

"We are further told by counsel for appellants that 'the fact of ownership by the Catholic Church, if such ownership is to be considered, is merely an incident.' It is a matter, however, we cannot overlook. The incident is in itself sufficient to raise the bar of section 30 of article IV of the constitution. We may well say that when the people adopted the state constitution, containing the inhibitive provisions herein quoted and invoked, it was to meet situations similar to the one now presented to us for decision.

"We have endeavored to make it clear that we are in sympathy with the meritorious movement having for its object the restoration and preservation of the missions, but no matter how praiseworthy we may believe such efforts to be, we must say that, in our opinion, the state constitution forbids that such work be done at the expense of the taxpayers. We believe that the act of the legislature under consideration is in manifest violation of sections 22, 30, and 31 of article IV of the state constitution, and that it is our duty to so declare."

In the instant case, the articles and bylaws of the Association make clear that its basic and essential purpose is *"to restore* the original significance of Christmas." By accepted definitions, this language expresses the purpose *to change* a prevalent attitude toward this religious holiday. The parade comprised of biblical scenes and religious music, the subject matter of the films being given to the Association at county expense, is the very vehicle designated by the Association to bring about this reconversion of the public.

Even if it were provided that the county reserved the power to dictate the script which would serve as the commentary on the film, the constitutional barriers would not be

overcome. What public official or group of public officials has the right or the power to determine the "official" attitude of the county toward such scenes as those described in the parade program attached to the pleadings as an exhibit, e.g. "The Annunciation," "The Angel Appears to Joseph," "Jesus Walking on the Water," "The Resurrection," and "The Ascension"?

Finally, it might be well to reiterate that here the county is not expending public funds to support the production and distribution of a film that will portray generally the many parades and festivals annually conducted within its boundaries, and of which this particular religious parade forms but an incidental part. On the contrary, the religious parade here involved constitutes the entire subject matter of the film and the other undesignated "attractions" of the county constitute only the incidental parts.

It is common knowledge that there are a great many other religious spectacles, festivals and parades, conducted and promoted by other groups, that also attract visitors to the county. Each of these groups doubtless would be willing, if they did not in fact insist upon their equal right, to assist in advertising the county by filming and distributing nationally at county expense their own functions. The strife likely to be engendered among such competing groups, no one of which could be decreed to be more meritorious than any of the others, is the precise danger which, as the court declared in *Frohliger* v. *Richardson, supra,* 63 Cal.App. 209, these constitutional guaranties were designed to eliminate.

It would be impossible to improve upon the warnings of Madison as summarized by Justice Rutledge, in his dissenting opinion in *Everson* v. *Board of Education, supra,* 330 U.S. 1, 53-54 [67 S.Ct. 504, 91 L.Ed. 711, 743, 168 A.L.R. 1392, 1423-1424]: "There cannot be freedom of religion, safeguarded by the state, and intervention by the church or its agencies in the state's domain or dependency on its largesse. ... The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences by the state. For when it comes to rest upon that secular foundation it vanishes with the resting. ... Public money devoted to payment of religious costs, educational or other, brings the quest for more. It brings too the struggle of sect against sect for the larger share or for any. Here one by numbers alone will benefit most, there another. That is precisely the history of societies which have had an established

religion and dissident groups. ... It is the very thing Jefferson and Madison experienced and sought to guard against, whether in its blunt or in its more screened forms. . . . The end of such strife cannot be other than to destroy the cherished liberty. The dominating group will achieve the dominant benefit; or all will embroil the state in their dissensions. . . .''

The judgment is affirmed.

Fox, P. J., concurred.

ASHBURN, J.—I dissent. The brief time which will elapse before the effective date of my retirement precludes elaboration of my views. Stated briefly they are as follows.

The making and furnishing of film prints of the Bethlehem Star Parade fall within the category of a public purpose the expense of which may be borne by a special tax under section 26100, Government Code—''for the purpose of inducing immigration to, and increasing the trade and commerce of, the county.'' Said section further provides, in part: ''The proceeds of the tax may be expended for any or all of the following uses: (a) Advertising, exploiting, and making known the resources of the county. (b) Exhibiting or advertising the agricultural, horticultural, viticultural, mineral, industrial, commercial, climatic, educational, recreational, artistic, musical, cultural, and other resources or advantages of the county.''

The fact that members of certain religious sects may derive more satisfaction from such a spectacle than do those of other denominations or those who adhere to no religion whatever does not spell a violation of the constitutional provisions concerning relations between Church and State. (Cal. Const., art. IV, § 30, and art. I, § 4; 1st and 14th Amends. to the U.S. Const.)

Collateral and incidental effects of such legislation do not constitute governmental departure from required neutrality in its relations and dealings with religious matters. This doctrine is exemplified by *Zorach* v. *Clauson,* 343 U.S. 306, 313-314 [72 S.Ct. 679, 96 L.Ed. 954, 961-962], *Everson* v. *Board of Education,* 330 U.S. 1, 8 [67 S.Ct. 504, 91 L.Ed. 711, 719-720, 168 A.L.R. 1392, 1400-1401], *Lundberg* v. *County of Alameda,* 46 Cal.2d 644, 654 [298 P.2d 1], *Bowker* v. *Baker,* 73 Cal.App.2d 653, 663 [167 P.2d 256], and *State* v. *Williamson* (Okla.) 347 P.2d 204.

In the *Zorach* case, which dealt with legislation providing

for release from public schools of pupils desiring to attend religious exercises elsewhere, the court said, at page 313 [72 S.Ct. 679, 96 L.Ed. at p. 962] : "We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. The government must be neutral when it comes to competition between sects."

In *State* v. *Williamson, supra,* (Okla.) 347 P.2d 204, plaintiff sought an injunction against the use of certain trust moneys for construction of a memorial chapel upon grounds belonging to the state and occupied by Whitaker State Orphans Home. The court said, at page 205 : "This memorial chapel when completed was to be owned by the State, to be maintained or managed by the State Board of Public Affairs and the Whitaker State Orphans Home, and to be used for and in connection with the Home for public assembly, and among other things, to provide a place for the voluntary worship of God by children of the Orphans Home, non-sectarian, non-denominational religious services might be conducted therein, but without requiring any child to attend any one of such services." At page 207 : "It is a well settled principle and philosophy of our Government that we should preserve separation of church and state, but that does not mean to compel or require separation from God. That would be directly contrary to cardinal precepts of the founding and

preservation of our government, for it is well settled and understood that ours is a Christian Nation, holding the Almighty God in dutiful reverence. It is so noted in our Declaration of Independence and in the Constitution of every State of the Union. Since George Washington's first presidential proclamation of Thanksgiving Day each such annual proclamation reiterates the principles that we are such a Christian Nation. Our State Senate and House of Representatives spend public funds maintaining on duty a Chaplain, though this expenditure is not made in aid of any sect or denomination. The same is true as to each branch of our National Congress. State paid Chaplains are employed at the State Penitentiary at McAlester, and the State Reformatory at Granite. In the early days of our National existence the Continental Congress allowed, and General George Washington ordered a Chaplain for each regiment of our troops, and that practice of use of chaplains has continued in all branches of our armed forces through the years. At West Point our National Government maintains a chapel and cadets are required to attend it. Our State maintains chapels at State Institutions such as the Griffin Memorial State Hospital at Norman, and the State Penitentiary at McAlester among others. A non-sectarian chapel was constructed at 'Girls' Town,' a State Institution, from funds raised by a state bond issue. At public expenditure we engrave on our coins, 'In God We Trust' and print the same on currency. Our National Motto adopted by joint resolution of Congress is 'In God We Trust.' Our National Anthem closes with these words 'In God is our Trust.' Then why not maintain chaplains and, in appropriate places, chapels available for use in the worship of God by those who desire to do so? . . .

"When we consider the language used in our Declaration of Independence and in our National Constitution, and in our Constitution of Oklahoma, wherein those documents recognize the existence of God, and that we are a Christian Nation and a Christian State, and when we note the encouragement therein given to the principle that we should recognize our dependence on God, and should promote worship of God, it is too difficult to see any constitutional provision indicating the slightest intention to prohibit the maintenance of chapels as they are maintained throughout our land, or to prohibit the construction of a chapel for use of the children in the Whitaker State Orphans Home at Pryor, Oklahoma."

I would reverse the judgment.