AMERICAN JEWISH CONGRESS; Eve Slaff; Alan Sieroty; Devera Lurie Waldman; Charles Waldman, Plaintiffs–Appellants,

v.

CITY OF BEVERLY HILLS; Allan L. Alexander, Mayor; Bernard J. Hecht; Robert K. Tanenbaum; Maxwell H. Salter; Vicki Reynolds, Defendants–Appellees,

and

Chabad of California, Inc., Defendant–Intervenor–Appellee.

No. 93–55085.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1994.

Decided Sept. 22, 1995.

Carol A. Sobel, ACLU Foundation of Southern California, Douglas E. Mirell, Los Angeles, CA, for plaintiffs-appellants.

Harry L. Gershon, Richards, Watson & Gershon, Los Angeles, CA, for defendants-appellees.

Jeffrey G. Kichaven, Alschuler, Grossman & Pines, Los Angeles, CA, for the defendant-intervenor-appellee.

Before: FLETCHER, CANBY and HALL, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiffs-appellants, the American Jewish Congress and individual members (collectively "the Jewish Congress"), challenge under the religion clauses of the United States and California constitutions the action of defendants-appellees, the City of Beverly Hills and individual officials (collectively "the City" or "Beverly Hills") in permitting defendant-intervenor-appellee Chabad of California, Inc., ("Chabad") to erect a 27–foot menorah in a public park near City Hall during the holiday season. The Jewish Congress also claims that the City's general policy and practice of permitting unattended displays of large religious objects on public property is unconstitutional. The district court granted summary judgment in favor of the City. We reverse.

I

Since 1986, Beverly Hills has allowed Chabad to erect a menorah in Beverly Gardens Park for approximately two weeks each year during the Chanukah season. The menorah is 27 feet tall and 24 feet wide, and weighs 5,500 pounds. It is bolted to a permanent, concrete foundation that the City allowed Chabad to install in the park; Chabad covers the foundation with sod during the rest of the year. Each branch of the menorah is topped with a small electric light that is lit at night in accord with Jewish custom. The menorah was designed by Yaacov Agam, a well-known artist. The City does not fund the menorah or Chabad.

Beverly Gardens Park is a twenty-block-long public park that cuts through the City on an east-west axis. The park is bordered on its south side by Santa Monica Boulevard, a four-lane arterial. The menorah sits on a block of the park bordered on the east by Crescent Drive and on the west by Canon Drive. Directly across Santa Monica Boulevard from the menorah is a building that formerly housed the U.S. Post Office and has been vacant since the early stages of this litigation. City Hall is one block up and one block over from the menorah, about 450 feet distant. The Beverly Hills Civic Center is located on the side of City Hall facing away from the menorah.

The City traditionally puts up a holiday display of its own, composed of two 35–foot live spruce trees strung with colored lights, and a 60–foot gold-foil "Season's Greetings" sign. This display is located one block west of the menorah, two blocks away from City Hall.

During Chanukah, Chabad organizes ceremonies centered around the menorah. Chabad terms these ceremonies "parties," but they involve the ritual lighting of the electric "candles" and the speaking and singing of

traditional Jewish prayers. Members of the City Council (which is also the body that approves the menorah's permit) have participated in these ceremonies each year, and some of them have served as "master of ceremonies." Local celebrities, of which Beverly Hills has no shortage, also attend. The Mayor was present on at least one occasion.[1]

The City generally does not permit its citizens to erect large unattended objects on public property. It does, however, have a "Special Events Permit" application procedure, and a form agreement titled "Holiday Installation of Religious Objects on City Property." Chabad has applied for a special events permit, and has signed a "Holiday Installation" agreement each year. At least since 1986, the City has not granted a permit for a large unattended object to any individual organization other than Chabad. In 1989, the City denied two permit requests from individuals: one for a "winter solstice" display, and one for a Latin cross. The City claimed that both applications were simply protests against the menorah,[2] and that it denied them because neither provided sufficient specifics.

In 1990, the Jewish Congress filed a complaint in federal district court, alleging that the City's action in permitting Chabad's menorah violated the Establishment Clause of the United States Constitution. After a hearing, the district court issued a temporary restraining order that required the City either to place the menorah in closer proximity to a Christmas tree or to put up a Christmas tree near the menorah. Thereafter, the City put Christmas decorations and lights on an 80–foot spruce standing 82 feet from the menorah. Also pursuant to the restraining order, Chabad erected a sign next to the menorah, which reads,

THIS MENORAH IS SPONSORED BY CHABAD OF CALIFORNIA. IT IS

NOT SPONSORED OR FUNDED BY THE CITY OF BEVERLY HILLS.

The sign faces busy Santa Monica Boulevard, but the parties dispute whether it can be read from a moving car. The district court also enjoined "any religious ceremonies, including, but not limited to, prayers, blessings, singing or rituals, of any type or nature at the site of the display." District Court Order of December 13, 1990 at 3. The TRO was dissolved on December 21, 1990, however, when the court decided that a preliminary injunction should be denied.

Almost two years later, the court denied the Jewish Congress's motion for summary judgment, and granted, *sua sponte,* summary judgment in favor of the City. The court made no findings, and did not state the legal justification for its ruling. It simply held that the City could continue to permit Chabad to display the menorah, provided that it was in close proximity to a Christmas tree of similar size and that if either was lighted, both must be lighted. It also ordered that the "disclaimer" sign facing Santa Monica Boulevard be altered so that it could be read from the opposite direction as well. The order was silent as to whether Chabad was allowed to continue holding Chanukah candle-lighting ceremonies at the menorah.

## II

### A.

Appellees do not question the Jewish Congress's standing to challenge the City's action in permitting Chabad's menorah, which derives from its claim that the City's alleged establishment of religion interferes with its right freely to use and enjoy Beverly Gardens Park. *See Kreisner v. City of San Diego,* 1 F.3d 775, 778 n. 1 (9th Cir.1993) (under federal Constitution), *cert. denied,* — U.S. ——, 114 S.Ct. 690, 126 L.Ed.2d 657 (1994); *Ellis v. City of La Mesa,* 990 F.2d

---

**1.** In contrast, the former mayor of Beverly Hills was strongly opposed to the ceremonies, which he called "distinctly religious." "Beverly Hills Under Fire for Allowing Menorah Rite," *Los Angeles Times,* Jan. 11, 1987, pt. 9, at 1; *see also* "Religious Symbols: 'Tis the Season for Contention," *Los Angeles Times,* Dec. 22, 1987, pt. 2, at 1.

**2.** The winter solstice display application began, "I note that once again the City of Beverly Hills will permit the display of a Jewish menorah, in observation of Chanukah. I hereby apply for equal time and space...."

1518, 1523–24 (9th Cir.1993) (under California Constitution), *cert. denied,* — U.S. —, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994). Appellees argue, however, that the Jewish Congress lacks standing to challenge the City's special events permitting scheme, because neither the Jewish Congress nor its individual members have attempted, or plan to attempt, to apply for a special events permit.

■ Appellees wrongly view the Jewish Congress's challenge to the City's permitting scheme as a classic "prior restraint" claim brought under the Free Speech Clause of the First Amendment. *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (free speech challenge to city ordinance regulating placement of news racks on public property). The Jewish Congress's challenge to the City's permitting scheme sounds not in its right to freedom of speech, but rather in its right to be free from governmental establishment of religion. The Jewish Congress contends that the primary effect of the City's permitting practice and policy is not to grant equal access to all speakers, but rather to endorse one particular religious speaker. The Jewish Congress's own efforts to secure a special event permit are irrelevant to its standing to bring this claim. Rather, it need only allege that the City's permitting scheme interferes with its right to use and enjoy the park. *See Kreisner,* 1 F.3d at 787 (plaintiff argued that city's permitting scheme gave preference to private religious group sponsoring holiday display and thus violated Establishment Clause; court analyzed merits of argument without separately considering plaintiff's standing); *Doe v. Small,* 964 F.2d 611, 619 (7th Cir.1992) (en banc) (also considering Establishment Clause challenge to city's permitting scheme without separately considering plaintiff's standing).

### B.

We review de novo the district court's grant of summary judgment in favor of the City, *Ellis,* 990 F.2d at 1523–24, and view the facts in the light most favorable to the Jewish Congress, *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994).

■ The Jewish Congress makes parallel arguments under the religion clauses of the California and United States constitutions.[3] As Article I, § 4 of the California Constitution includes language virtually identical to the federal Establishment Clause, *see infra,* we need not analyze Chabad's federal claim separately.[4]

### C.

The Jewish Congress contends that the City's action in permitting Chabad's menorah violates article I, section 4 and article XVI, section 5 of the California Constitution. Article I, section 4 contains two relevant provisions. The first, in "language virtually identical to the Establishment Clause of the First Amendment," provides that " '[t]he Legislature shall make no law respecting an establishment of religion.' " *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1395 (9th Cir.) (quoting Cal. Const. art. I, § 4 [the "Establishment Clause"] ), *cert. denied,* — U.S. —, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994). The second, in "language having no counterpart in the federal constitution," *id.,* states that

---

3. Although the Jewish Congress argued under both the state and federal provisions in the district court, the court's order granting summary judgment mentions neither constitution.

4. Because of the prudential policy not to decide federal constitutional questions if alternative grounds are available, if the district court finds a state constitutional violation, it need not reach the federal claim. *Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909); *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1392 (9th Cir.) (when state constitutional provisions offer more expansive protection than the federal Constitution, court must address state claims in order to avoid unneces-

sary consideration of federal constitutional claims), *cert. denied,* — U.S. —, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994).

However, this policy does not relieve us of our duty to consider Chabad's federal claim. The rule of *Siler* applies only when a decision on state claims is *dispositive. Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974) (noting "the ordinary rule that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available"). Because we merely remand on the state claim, we do not know whether that claim is dispositive.

"[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. art. I, § 4 [the "No Preference Clause"]. Finally, article XVI, section 5 provides,

> Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose.... nor shall any grant or donation of personal property or real estate [be made by governmental entities for religious purposes].

Cal. Const. art. XVI, § 5.

1. *The Establishment Clause*

█ Regarding the state Establishment Clause, the California Supreme Court has stated that "cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution." *Raven v. Deukmejian*, 52 Cal.3d 336, 801 P.2d 1077, 1088, 276 Cal.Rptr. 326 (1990) (citation and internal quotation marks omitted). We are aware of no California case construing the state Establishment Clause differently, in any way relevant to this case, from its "virtually identical" federal counterpart. *See Vernon*, 27 F.3d at 1395; *cf. Sands v. Morongo Unified Sch. Dist.*, 53 Cal.3d 863, 281 Cal.Rptr. 34, 45, 809 P.2d 809 (1991) (determining that government endorsement of school graduation prayers violates federal Establishment Clause, and holding without further analysis that this practice also violates Establishment Clause of California Constitution), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992).

Thus, our analysis of the Establishment Clause of the California Constitution looks to the federal Constitution. The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The United States Supreme Court has interpreted the Establishment Clause to mean that

> government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*County of Allegheny v. ACLU*, 492 U.S. 573, 590–91, 109 S.Ct. 3086, 3099–100, 106 L.Ed.2d 472 (1989) [hereinafter "*Allegheny County*"]. At core is "the prohibition against governmental endorsement of religion 'preclud[ing] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred.*'" *Id.* at 593, 109 S.Ct. at 3101 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in the judgment)) (emphasis in original).

Chabad's placement of the menorah in Beverly Gardens Park is private religious expression. *See Allegheny County*, 492 U.S. at 613, 109 S.Ct. at 3111 (menorah is religious symbol).[5] The Establishment Clause bars the State from showing favoritism to sectarian religious speech and from "manipulat[ing] its administration of a public forum close to the seat of government (or within a government building) in such a manner that only certain religious groups take advantage of it, creating an impression of endorsement that is in fact accurate." *Capitol Sq. Review and Advisory Bd. v. Pinette*, ⸺ U.S. ⸺, ⸺, 115 S.Ct. 2440, 2449, 132 L.Ed.2d 650 (1995) (Scalia, J., writing for four justices). In addition, we consider endorsement from

---

**5.** After the district court's initial adverse decision, the City and Chabad acted to "Alleghenyize" the menorah by putting a string of colored light bulbs on an 80-foot spruce tree nearby. Chabad also put up a sign under the menorah, disclaiming City sponsorship. Whereas the menorah-Christmas tree-liberty sign combination in *Allegheny County* was originally conceived as a coherent, unitary display, here the menorah originally stood alone. The tree nearby was decorated only in response to the court's order. Any secular message that the City might have accomplished by "Alleghenyizing" the menorah was deeply undercut by the religious ceremonies that took place at the menorah (and, pointedly, not at the tree).

the viewpoint of the "reasonable observer [who] evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *Id.* at —, 115 S.Ct. at 2454–55 (O'Connor, J., concurring) (internal quotation and citation omitted).

■ Although Beverly Hills had a nominal policy permitting the erection of large, unattended structures in Beverly Gardens Park, the City has denied all applications except Chabad's at least since 1986.[6] The Jewish Congress claims in effect that the City practices favoritism. In addition, the Jewish Congress argues that Chabad's menorah conveys a message of City endorsement because of its proximity to City Hall.

■ The menorah is about 450 feet from the closest governmental building, Beverly Hills City Hall, and is separated from City Hall by two streets, one of which—Santa Monica Boulevard—is four lanes wide. But distance from the seat of government is not the only factor to consider in deciding whether a reasonable observer would perceive government endorsement of the menorah. We must also take into account the fact that the menorah is a 27–foot, 5,500–pound sculpture. According to Beverly Hills's own policy and practice, this is the type of object that only the City erects. The reasonable observer, charged with general knowledge of such local regulations, might therefore infer City participation, if not direct City action, in the menorah's construction and placement.[7]

This inference would be strengthened as the menorah returned at Chanukah season for two weeks year after year, while at all other times its place was vacant and such private structures did not appear elsewhere in the park. "[A] private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval." *Id.* at —, 115 S.Ct. at 2454 (O'Connor, J., concurring).

■ In addition, City Council members participated in religious ceremonies involving the menorah. That the City used the strip of park near City Hall to convey governmental messages is evidenced by its own "Holiday Greetings" display, which is located in the park one block *farther away* from City Hall. Chabad's disclaimer may have been insufficient to overcome these strong indications of government endorsement or outright favoritism. *See generally id.* at — n. 2, 115 S.Ct. at 2462 n. 2 (Souter, J., concurring) (presence of disclaimer does not always remove possibility that private religious display conveys a message of favoritism "when other indicia of endorsement ... outweigh the mitigating effect of the disclaimer, or when the disclaimer itself does not sufficiently disclaim government support").[8]

6. The Jewish Congress also challenges under the Establishment Clause the City's permitting scheme and practice, claiming that the City categorically forbids the erection of large unattended displays on public property, and then vests standardless discretion in its officials to grant "exceptions" to the rule. The Jewish Congress argues that the City has applied its scheme unfairly, in that it has never granted a permit to any party other than Chabad and has unfairly denied the "winter solstice" and "Latin cross" permit applications. Such actions would violate the Establishment Clause. *See Kreisner,* 1 F.3d at 787 (considering appellant's claim that city's permitting scheme gave unconstitutional preference to religious group); *Doe v. Small,* 964 F.2d 611, 619 (7th Cir.1992) (en banc) (considering similar claim). Because the Jewish Congress has raised triable factual issues with respect to its challenge to the City's permitting policy and practice, the district court erred in granting the City's motion for summary judgment on this claim.

7. More generally, while a reasonable passerby would never infer city endorsement of a soapbox speaker in the park, he or she would be much more likely to infer such endorsement from a large, unattended *sculptural object* like Chabad's menorah. *See generally Capitol Square,* — U.S. at —, 115 S.Ct. at 2458 (Souter, J., concurring) (noting that "an unattended display (and any message it conveys) can naturally be viewed as belonging to the owner of the land on which it stands").

8. The *Capitol Square* plurality rejected any inquiry into the adequacy of a disclaimer, reasoning that requiring disclaimers only of religious displays would be discriminatory and that no workable standard exists for determining the adequacy of a disclaimer. *Capitol Square,* — U.S. at — and n. 4, 115 S.Ct. at 2450 and n. 4 (Scalia, J., writing for four justices). Three justices endorsed the Court's traditional inquiry into the adequacy of a disclaimer. *Id.* at —, —, 115 S.Ct. at 2453, 2462 (O'Connor, J., Souter, J., and Breyer, J., concurring). Justice Stevens wrote that no disclaimer "could dispel the message of endorsement in this case." *Id.* at — n. 13, 115 S.Ct. at 2469 n. 13 (Stevens, J., dissenting). Justice Ginsburg left the question of whether a dis-

■ We conclude that there is a triable issue as to whether a reasonable observer,[9] confronted with a single large sculptural object located near City Hall, in an area where only the City itself erects such objects, and near another City-sponsored display, might identify the City as the menorah's sponsor, especially when City Council members actively participated in devotional ceremonies at the menorah.[10]

### 2. The No Preference Clause

California's No Preference Clause "has been interpreted by California state courts as being broader than the Establishment Clause of the First Amendment." *Vernon*, 27 F.3d at 1395 (citing *Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 254 Cal.Rptr. 913, 916 (2d Dist.1989); *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 869, 587 P.2d 663 (1978)).

> The Attorney General of [California] has observed that "[i]t would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion" than that found in the "no preference" clause, and California courts have interpreted the clause as being more protective of the principle of separation than the federal guarantee.

*Sands*, 281 Cal.Rptr. at 45, 809 P.2d at 820 (citations omitted). Thus, if the district court were to find no violation of the Estab-

lishment Clause, it would still be required to consider whether the No Preference Clause was violated.

■ The No Preference Clause prohibits not only the establishment of religion, but also "any *appearance* that the government has allied itself with one specific religion." *Vernon*, 27 F.3d at 1395 (citing *Ellis*, 990 F.2d at 1524; *Hewitt v. Joyner*, 940 F.2d 1561, 1566–67 (9th Cir.1991), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992)) (emphasis supplied).

The California courts have construed the No Preference Clause in two cases that challenge religious displays on public property. In *Fox*, the California Supreme Court held unconstitutional Los Angeles's practice of displaying, on Easter and Christmas, an enormous illuminated cross in the windows of the City Hall building. 150 Cal.Rptr. at 869–70, 587 P.2d at 665–66; *see also id.* at 874, 587 P.2d at 670 (Bird, C.J., concurring) ("Los Angeles has identified itself with the central symbol of one religion"). In *Okrand*, the California Court of Appeal found no violations of either the state or federal Constitutions where Los Angeles allowed Chabad of California to display an historically significant menorah in the City Hall rotunda during Chanukah. 254 Cal.Rptr. at 921–22. The menorah, which the court held to be "much more a museum piece than a symbol

---

claimer in front of a cross could survive the Establishment Clause for another day. *Id.* at ——, 115 S.Ct. at 2475 (Ginsburg, J., dissenting). As we read *Capitol Square*, a disclaimer is better than nothing but may not be enough.

9. In *Capitol Square*, a majority of the Court, contrary to the plurality, retains the endorsement test that "necessarily focuses upon the perception of a reasonable, informed observer." *Capitol Square*, —— U.S. at ——, ——, 115 S.Ct. at 2452, 2466, 2474–75 (O'Connor, J., concurring; Stevens, J., dissenting; Ginsburg, J., dissenting).

10. Judge Hall's concurrence cites *Capitol Square* for the proposition that the City has violated the Establishment Clause only if it has engaged in outright favoritism. It rejects the notion that a violation may occur absent favoritism, even if a reasonable observer would infer official endorsement of the private religious display.

The concurrence misreads the positions of the justices in *Capitol Square*. The four-justice plu-

rality rejected this endorsement principle in the case of a private religious display, *Capitol Square*, —— U.S. at —— – ——, 115 S.Ct. at 2447–50 (Scalia, J., writing for four justices), but the remaining five justices—albeit in separate opinions—embraced some version of the endorsement test to determine whether a private religious display on public property might be perceived as endorsed by the public entity. *See id.* at —— – ——, ——, —— – ——, 115 S.Ct. at 2452–54, 2469, 2474–75 (O'Connor, J., Souter, J., and Breyer, J., concurring; Stevens, J., dissenting; Ginsburg, J., dissenting). Thus, the district court must employ the test if it determines that the City did not accord Chabad preferential treatment. Contrary to the concurrence, the inquiry is necessary on the facts of this case if the district court finds no favoritism. For example, facts are in dispute as to whether the disclaimer was visible to and readable by passersby and as to the effect on observers of City representatives' participation in ceremonies at the site of the menorah.

of religious worship," *id.,* 254 Cal.Rptr. at 922, was placed next to a Christmas tree decorated with "ornaments presented by various ethnic and cultural groups." *Id.,* 254 Cal.Rptr. at 915.

We, too, have had occasion to construe California's No Preference Clause in cases involving the constitutionality of religious displays. In *Hewitt,* we found a violation of the No Preference Clause when San Bernardino County used public funds to maintain a park that contained thirty-six large, immovable religious statues and tableaus. Although the County argued that it maintained the park for the secular purpose of tourism, we concluded that it had "violated the California Constitution by *appearing* to endorse the religious message of [the] sculptures." 940 F.2d at 1569 (emphasis added). In *Ellis* we found a violation of the No Preference Clause by a city and county that maintained two mountain-top crosses on public property and by another city that displayed an enlarged hillside cross on its official insignia. We discerned an unmistakable "appearance of religious preference" in the city's and county's display of the crosses, which "dominate[d] the area," and in the insignia, which appeared on city employees' uniforms, official correspondence, and police motor vehicles. 990 F.2d at 1525–28.

In *Ellis* we reviewed *Fox, Okrand* and *Hewitt,* and distilled from them five factors "that are relevant to determining whether, when viewed in its historical and physical context, a given display on public property violates the California Constitution." *Id.* at 1524–25. These factors are: 1) the display's religious significance; 2) its size and visibility; 3) its inclusion of symbols from other religions;[11] 4) its historical background; and 5) its proximity to government buildings or religious facilities. *Id.* at 1525. We now consider Chabad's menorah in light of these five factors.

### a. *Religious Significance of the Menorah*

Like the Latin cross found in *Fox* to be an unmistakably religious symbol, 150

Cal.Rptr. at 870, 587 P.2d at 666; *see also id.* at 868, 587 P.2d at 666; (quoting lower court's finding that "the single-barred cross is a symbol particularly pertinent to the Christian religion"), the menorah is a religious symbol. *Allegheny County,* 492 U.S. at 613, 109 S.Ct. at 3111 (the menorah "is a religious symbol: it serves to commemorate the miracle of the oil as described in the Talmud") (opinion of Blackmun, J.). Moreover, just as the religious significance of the crosses in *Ellis* was emphasized by their "use as a backdrop for Christian celebrations such as baptisms, weddings, and Easter sunrise services," 990 F.2d at 1525; *see also id.* at 1527, the religious significance of Chabad's menorah here has been reinforced by the Chanukah ceremonies conducted beneath it.

### b. *Size and Visibility*

We noted in *Ellis* that "the 36–foot cross stands alone at the summit of a high hill. . . . It dominates the area, as did the statues in *Hewitt.*" *Id.* at 1526 (citing *Hewitt,* 940 F.2d at 1568). Here, too, the size and visibility of Chabad's menorah suggest that it stands out as a religious symbol. The menorah, at 27 by 24 feet, is similar in size to the crosses in *Ellis,* and it stands in a public park bordered by a major thoroughfare along which more than 100,000 cars travel daily. It bears little resemblance to the much smaller menorah considered in *Okrand,* which "stood unlit in a corner of the rotunda." 254 Cal.Rptr. at 921.

### c. *Inclusion of Other Religious Symbols*

The menorah allowed to stand in *Okrand* was placed next to "a Christmas tree decorated with ornaments presented by various ethnic and cultural groups. In 1983, the Christmas tree was decorated with 'Kawanza' Christmas ornaments, carved wooden icons from South Africa." *Id.,* 254 Cal.Rptr. at 915. The *Okrand* court was confident that the menorah posed no danger of conveying a message of governmental preference for Judaism, *id.,* 254 Cal.Rptr. at 921, just as the Supreme Court in *Allegheny County* found

---

11. We note that violations of the No Preference Clause, unlike Establishment Clause violations, can be avoided by the fair and unrestricted inclusion of admittedly religious symbols from differing traditions.

that the menorah's presence next to a Christmas tree and sign proclaiming "liberty" was "not an endorsement of religious faith but simply a recognition of cultural diversity." 492 U.S. at 619, 109 S.Ct. at 3115. Here, in contrast, the menorah originally stood alone, and only in response to the district court's restraining order did the City string a nearby tree with some Christmas lights. Whether that concession conveys a sincere message of religious pluralism and tolerance is in doubt; the curative effect of the City's action seems minimal at best.

### d. *Historical Significance*

"Even a purely religious symbol may acquire independent historical significance by virtue of its being associated with significant non-religious events." *Ellis*, 990 F.2d at 1526. That was precisely the case in *Okrand*, where the menorah had been commissioned in the early 1800's, crafted in Italy, housed in the Great Synagogue of Katowitz in Poland, and brought to the United States after being "rescued from the flames of the Holocaust." 254 Cal.Rptr. at 915 n. 5. The Katowitz menorah stood next to a sign that relayed this information to curious passersby, and was thus "much more a museum piece than a symbol of religious worship." *Id.*, 254 Cal.Rptr. at 922. Here, in contrast, the menorah was commissioned by Chabad for placement in Beverly Gardens Park. The City presents "no historically significant facts independent of the [menorah's] inherently religious nature." *Ellis*, 990 F.2d at 1526; *see also id.* at 1527–28 (even Mt. Soledad cross's historical function as war memorial was "not enough to satisfy the more separationist No Preference Clause of the California Constitution").

### e. *Location*

Chabad's menorah is much nearer to "institutions of government" than were the crosses at issue in *Ellis*, but it is not "on an explicit government edifice as were the city hall displays challenged in *Fox* and *Okrand.*" *Ellis*, 990 F.2d at 1526. Despite its location

apart from City Hall, however, a reasonable observer might be more likely to perceive Beverly Hills's imprimatur on the menorah because the City itself maintains a holiday display in the next block of Beverly Gardens Park, and apparently has been the only entity to erect large sculptures in its public parks. We note again that the No Preference Clause forbids even the *appearance* of governmental preference for one religious faith. *Hewitt*, 940 F.2d at 1566–67.

In sum, the five-factor analysis suggests that the Jewish Congress might well be able to prove at trial that Chabad's menorah conveys an impression of governmental preference rising at least to the level found impermissible in *Ellis*. Moreover, the appearance of governmental preference would be exacerbated were the Jewish Congress to prove, as seems possible, that the ceremonies conducted at the menorah, in which local government officials took part (some of whom were responsible for approving Chabad's request to erect the menorah), were religious. The Jewish Congress might also be able to prove that the City has demonstrated favoritism in granting a permit only to Chabad. We conclude that the Jewish Congress has established triable issues of fact with respect to its No Preference Clause challenge, and that the district court erred in granting the City's motion for summary judgment.[12]

### 3. *Article XVI, Section 5*

The Jewish Congress also contends that the City has violated article XVI, section 5 of the California Constitution, under which a governmental entity may not "grant anything to or in aid of any religious sect, creed, or sectarian purpose." Cal. Const. art. XVI, § 5. The Jewish Congress argues that the City's action in allowing Chabad to sink five permanent concrete foundations four feet deep into Beverly Gardens Park amounts to a "public dedication of City land" for a religious purpose. Reply Brief at 15 n. 11.

---

**12.** For the reasons discussed above, the Jewish Congress has also raised triable issues of fact as to whether the City's permitting policy and practice violates the No Preference Clause of the California Constitution.

We have characterized article XVI, section 5 as "a broad ban on the use of public *property* or funds to support religious purposes." *Hewitt*, 940 F.2d at 1569 (emphasis added). The California Supreme Court has similarly stated that "article XVI, section 5 forbids *all* forms of governmental aid to religion." *Fox*, 150 Cal.Rptr. at 873, 587 P.2d at 669 (Bird, C.J., concurring) (emphasis in original). The provision has been broadly interpreted, *Hewitt*, 940 F.2d at 1569, and employed to invalidate a number of diverse types of state support for religion. In *Fox*, article XVI, section 5 was violated because the city expended $103 in public funds to illuminate a cross. 150 Cal.Rptr. at 875 & n. 7, 587 P.2d at 671 & n. 7 (Bird, C.J., concurring). In *County of Los Angeles v. Hollinger*, 221 Cal.App.2d 154, 34 Cal.Rptr. 387 (2d Dist.1963), the court refused to enforce a contract that obligated the County to make a tourist film of a religious organization's Christmas parade, because the County would, pursuant to state law, have to compensate the organization for filming its parade. 34 Cal.Rptr. at 390. In *Frohliger v. Richardson*, 63 Cal.App. 209, 218 P. 497 (Ct. App.1923), the court blocked the use of public funds to restore the San Diego Mission, despite the Mission's conceded "historical and educational interests." 63 Cal.App. at 217, 218 P. 497. And in *California Teachers Assn. v. Riles*, 29 Cal.3d 794, 176 Cal.Rptr. 300, 632 P.2d 953 (Cal.1981), the California Supreme Court held it unconstitutional for state schools to lend textbooks to parochial schools.

■ By allowing Chabad to sink permanent foundations in a public park, the City has certainly lent "aid." Indeed, were the roles reversed such that the City sank identical foundations in private land, such action would rise to the level of a compensable "taking" under both the federal and state Constitutions. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); [13] *Varjabedian v. City of Madera*, 20 Cal.3d 285, 142 Cal.Rptr. 429, 437, 572 P.2d 43, 51 (1977) ("direct physical invasion . . . indisputably require[s] compensation"). It is no defense that the City's aid might seem inconsequential, because "article XVI, section 5 admits of no de minimis exception." *Fox*, 150 Cal. Rptr. at 875, 587 P.2d at 671 (Bird, C.J., concurring); *see Hewitt*, 940 F.2d at 1571 (quoting *Fox* with approval).

■ We agree with the Jewish Congress that the City effectively has dedicated a portion of public lands to Chabad's use. The benefit to Chabad could be permitted as merely "incidental" and thus not violative of article XVI, section 5 only if the City had, as a matter of historical practice and policy, allowed diverse groups on a non-discriminatory basis to make similar permanent, physical occupations of City parks for aesthetic, social, and political purposes. *See Hewitt*, 940 F.2d at 1571 (noting that California courts have held that aid to religion that is only indirect or incidental to valid secular goals does not violate article XVI, section 5) (citing *Riles*, 176 Cal.Rptr. at 309, 632 P.2d at 962). As explained above, we have grave doubts that the City can prove any such practice and policy. At a minimum, the facts are disputed and remain to be litigated. Clearly, the district court erred in granting the City's motion for summary judgment on this issue.

### III

The Jewish Congress has raised substantial challenges to the City's actions.[14] Thus, the district court erred in granting the City's motion for summary judgment on the Jewish Congress's state Establishment and No Pref-

---

**13.** In *Loretto* the Supreme Court held that a "minor but permanent physical occupation of an owner's property," *id.* 458 U.S. at 421, 102 S.Ct. at 3168, if authorized by the government, constitutes a taking. *Id.* at 438, 102 S.Ct. at 3177. In that case New York City required Jean Loretto to allow Teleprompter to install a one-half inch TV cable along the side and roof of her apartment building. *Id.* at 422, 102 S.Ct. at 3168–69.

**14.** We note that some of the most important disputed factual issues upon which these challenges depend include the City's permitting practice and policy, its rejection of the "Winter Solstice" and "Latin Cross" applications to install unattended displays in the park, the nature of the ceremonies conducted at the menorah, and the City's past practice and policy for permitting permanent installations in city parks.

erence clause and article XVI, section 5 claims. Because the state Establishment Clause is virtually identical to the federal Establishment Clause, we also hold that the district court erred in granting summary judgment on the federal claim.[15] We reverse and remand for further proceedings on all of the Jewish Congress's claims. We do not preclude the possibility of summary judgment in favor of the Jewish Congress upon a renewed motion. Otherwise, the claims should be tried.

■ The Jewish Congress has requested attorneys' fees on appeal under 42 U.S.C. § 1988. An award of fees at this stage would be premature because the Jewish Congress is not yet a "prevailing party." Although the Jewish Congress has succeeded in reversing the adverse summary judgment, it has not yet "established [its] entitlement to some relief on the merits of [its] claims." *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam); *see Tribble v. Gardner*, 860 F.2d 321, 328 (9th Cir.1988), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). Should the Jewish Congress ultimately be the prevailing party in this litigation, it will be entitled to reasonable attorneys' fees for this appeal.[16]

REVERSED and REMANDED.

CYNTHIA HOLCOMB HALL, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I concur in Parts II.C.2 and II.C.3 of the majority opinion, and I concur in the judgment. I cannot join, however, the majority's treatment of the state and federal Establishment Clause issues presented by this appeal.

I agree with the majority insofar as it concludes that the Jewish Congress has raised a triable issue of fact as to whether the City of Beverly Hills has favored Chabad of California in its administration of holiday displays in Beverly Gardens Park. The federal Establishment Clause, among other things, forbids governmental entities from giving sectarian religious groups preferential access to public property. *Capitol Square Review & Advisory Board v. Pinette*, —— U.S. ——, ——————, 115 S.Ct. 2440, 2448–49, 132 L.Ed.2d 650 (1995) (plurality opinion); *see, e.g., County of Allegheny v. ACLU*, 492 U.S. 573, 599–600, 109 S.Ct. 3086, 3104–05, 106 L.Ed.2d 472 (1989) (county impermissibly favored sectarian religious speech by giving it preferential access to the "Grand Staircase" of the county courthouse). It appears from the record that the City of Beverly Hills may have manipulated its holiday display policy to favor Chabad and its two-and-one-half ton menorah. This the City of Beverly Hills may not do.

The majority, however, goes on to suggest that even if the City of Beverly Hills did not actually favor Chabad by giving it preferential access to Beverly Gardens Park, there still is a material issue of fact as to whether a reasonable observer would "identify the City as the menorah's sponsor." Maj. op. at 1546. The majority assumes that government may violate the Establishment Clause by tolerating religious speech on government property, even when it grants permission to speak in an entirely nonpreferential manner. This is where the majority and I part company. Its peculiar use of a "perceived endorsement" test has no place in this litigation. Here a city has allowed a private group to use one of its parks for religious expression. Such action offends the Establishment Clause only if the city in allowing the speech has favored religion over nonreligion or one religious sect over another.[1] *See Capitol Square Review &*

---

15. Should the district court find a state but not a federal constitutional violation, it should consider whether California's constitutional provision violates the freedom of speech or religion provisions of the Federal Constitution.

16. We do not preclude an award of fees for services in respect to other aspects of this litigation.

1. I do not take lightly the majority's accusation that I misread *Capitol Square*. *See* maj. op. at

1546 n.10. The majority pretends that *Capitol Square* "held" that the perceived endorsement test applies to private religious speech. For this "holding" the majority relies on the concurring opinions by Justices O'Connor, Souter, and Breyer, and the dissenting opinions by Justices Stevens and Ginsburg. *See Capitol Square*, —— U.S. at ——————, ——————, ——————, ———————, 115 S.Ct. at 2451–57, 2457–62, 2464–73, 2474–75 (O'Connor, J., Souter, J., and Breyer, J., concurring; Stevens, J., Ginsburg, J., dissenting).

*Advisory Board v. Pinette*, — U.S. at —— ——, 115 S.Ct. at 2446–49 (plurality opinion). If the City has not engaged in such favoritism, it has not violated the Establishment Clause. *Id.*

It makes no difference that some hypothetical observer might mistake—even reasonably—the private religious expression as officially sponsored. Indeed, if a state were to ban private religious speech from an otherwise open forum on the ground that some observer might wrongly suspect official sponsorship, I am confident we would find a violation of the Free Speech Clause, since the exclusion would constitute content discrimination. *See, e.g., Capitol Square Review & Advisory Board v. Pinette*, — U.S. at —— ——, 115 S.Ct. at 2446–50 (so holding) (plurality opinion); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, — U.S. ——, —— – ——, 113 S.Ct. 2141, 2147–48, 124 L.Ed.2d 352 (1993) (school district violated Free Speech Clause by denying application to use school facilities solely because of the applicant's religious viewpoint); *Widmar v. Vincent*, 454 U.S. 263, 274, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981) (public university may not rely upon Establishment Clause to deny religious groups access to open forum).

The majority would relegate private religious expression to second class status, banishing it from the public sphere so long as some observer *could* mistakenly believe that the government itself was speaking. Yet, "[o]ur precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private ex-

pression." *Capitol Square Review & Advisory Board v. Pinette*, — U.S. at ——, 115 S.Ct. at 2446 (Scalia, J., writing for the Court). I agree that government may not, consistent with the Establishment Clause, favor or promote sectarian religious expression, but I cannot agree that private religious speech is subject to veto by those who see official favoritism where there is none.

I am also troubled by the majority's dubious application of its perceived endorsement test to the facts of this case. The majority concludes that a "reasonable observer" might mistakenly perceive the menorah in Beverly Gardens Park as officially sponsored. Yet, right next to the menorah is a sign that reads, in large, block print:

**THIS MENORAH IS SPONSORED BY CHABAD OF CALIFORNIA. IT IS NOT SPONSORED OR FUNDED BY THE CITY OF BEVERLY HILLS.**

It seems to me that a reasonable observer would have little trouble divining the meaning of the disclaimer: Chabad, not the City of Beverly Hills, is the voice behind the menorah. Even if I thought that the perceived endorsement test had any application to private religious speech, I could not agree that there was any question here as to the perceived identity of the menorah's sponsor.

As the majority understands *Capitol Square*, these five justices agreed upon a proposition of law (the "endorsement" test) but differed on its application. This simply is not so.

I quite agree that Justices O'Connor, Souter, and Breyer would apply something very much like the "reasonable observer" test that the majority wishes to apply here. *Id.* at —— —— ——, 115 S.Ct. at 2454–55, 2457–58 (O'Connor, J., Souter, J., and Breyer, J., concurring). However, Justice Stevens, whose vote the majority also counts, would apply a much different test. *Id.* at —— & n. 5, 115 S.Ct. at 2466 & n. 5 (criticizing Justice O'Connor's "reasonable observer" test as too tolerant of religious expression in public spaces). As for Justice Ginsburg, it is not at all clear exactly what kind of test she

would apply. *Id.* at —— – ——, 115 S.Ct. at 2474–75 (Ginsburg, J., dissenting). One might guess from reading between the lines of her dissent that she would apply some version of the perceived endorsement test, but she never details the test she thinks appropriate for private speech cases.

In short, despite what the majority says, no five justices in *Capitol Square* agreed on a proposition of law that we are bound to apply in this case. I would take the approach detailed by Justice Scalia in his opinion for the plurality. *Id.* at —— – ——, 115 S.Ct. at 2442–50 (opinion of Scalia, J.). The majority rejects this approach, but never explains why, preferring instead to rely on its view of *Capitol Square's* "holding."